(No. 57444.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LARRY JOE ADAMS, Appellant.

*Opinion filed October 3, 1985.—Rehearing denied December 2,1985.*

104

Charles M. Schiedel, Carroll J. King and Gary S. Rapaport, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert, Michael V. Accettura and James V. Cinotto, Assistant Attorneys General, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

After the defendant, Larry Joe Adams, was found guilty of the murder of pharmacist Eugene Ponder fol-

lowing a jury trial in the circuit court of Madison County, the prosecution asked for a hearing on the question of whether the death penalty should be imposed (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)). Following the hearing, the jury sentenced the defendant to death, and the trial court entered judgment on the verdict. Execution of the sentence was automatically stayed pending direct appeal to this court under Rule 603 (87 Ill. 2d R. 603).

Eugene Ponder was a pharmacist who operated the "Prescription Shop" in Alton. Sherry Markham, an employee of Ponder's, was on duty on May 10, 1982, when the defendant entered the Prescription Shop between 4:15 and 4:30 p.m. Responding to his question, Markham told the defendant that the store did not carry protein powder mix. At approximately 5:02 p.m., as Markham was leaving the store for the day, Dr. Stephen Snitzer, a dentist who had an office in the building, came into the store. While the dentist was visiting with Ponder, the defendant returned to the store. The defendant and his sister had been patients of Snitzer's, and Snitzer inquired about his sister's health. After asking Ponder a question regarding a vitamin, the defendant moved to the area where food supplements were displayed. Snitzer left the store, leaving the defendant alone with Ponder. A customer came to the drive-up window of the store about 5:12 p.m. and picked up a prescription from Ponder. That was the last time he was seen alive. At approximately 5:18 p.m., Patricia Howell saw a man looking "very much like" the defendant running "very, very, fast" from the vicinity of the store, with a large paper bag in his hand. She had stopped at an intersection near the store and as she began to proceed again, she had to stop suddenly to avoid hitting the defendant, who ran in front of her car. Howell testified that the defendant was running not simply to avoid her car, but was running "with a purpose."

Mrs. Ponder had the practice of phoning her husband every afternoon around five o'clock. That afternoon she called "shortly after 5," and there was no answer. Mrs. Ponder then drove to the Prescription Shop and, upon entering the store, found the cash register open. She searched the store and found Ponder lying face down on the floor of the furnace room downstairs. Her husband was bleeding, and Mrs. Ponder called the fire department rescue squad.

When the first officer arrived, Ponder was dead. The autopsy showed that he had three bullet wounds, the fatal one being at the right temporal skull. Two other bullets penetrated Ponder's right lateral thorax and right hip, and there was an abrasion on the crown of his head. A ballistic examination showed that the bullets were fired from the same gun, either a .22-caliber Wamo rifle or a .22-caliber Roehm revolver. The murder weapon was never recovered. A fingerprint matching the defendant's was lifted from a bottle containing vitamin tablets that was found near the cash register on the sales counter of the store.

On May 11, the following day, the defendant was brought in for questioning. His *Miranda* rights were read to him, and he said that he understood them. He agreed to and did make a statement, which was reduced to writing and signed by him. The defendant stated that he visited the Prescription Shop twice. His description of his first visit matched that of the testimony of Sherry Markham. He said that on his second visit to the Prescription Shop he talked with Mr. Ponder about vitamin E, and then purchased a bottle of vitamin E tablets. The tablets in the bottle, according to the defendant, were 500-milligram tablets and the bottle contained 100 tablets. Adams stated that he paid about $4.90 for the bottle. Ponder rang it up on the register, and he left the store. Adams said that as he crossed the street, he had

to "start trotting," to avoid being hit by Mrs. Howell's car. He stated that he then hitchhiked to the home of one Shirley McClaine, in East Alton, and left the bottle of vitamin E there. When the defendant's statement was typed, the police asked Adams to take them to Shirley McClaine's home, and he agreed. According to police testimony, Adams changed his mind and declined to take them to McClaine's house. At that time he was charged with murder and armed robbery.

Subsequent investigation disclosed evidence that contradicted parts of Adams' recital of events. There was no sale of $4.90 found on the cash-register tape. No such sale was entered on the sales-tax sheet that applied to vitamins and other nonprescription items. The last entry on the register was a "no sale," which indicated that the cash drawer was opened without a sale taking place. There was testimony that vitamin E is sold in terms of international units, and not in terms of milligrams. The East Alton police assisted in conducting a search for Shirley McClaine, but found no evidence that a person by that name lived in East Alton.

At trial, the defendant denied that he agreed and then later refused to take the police to McClaine's house. He denied ever being asked to lead them to her.

An acquaintance of Adams', James Havis, testified for the People that on April 23, 1982, the defendant stopped him and asked him if he had a gun for sale. He said no, and asked why Adams wanted one. Adams replied that he wanted to commit a robbery at a drugstore where the "dude [would] be there all by himself." Adams told Havis that he was going to get some pills and he knew someone who could "front them off for him." On May 4 or 5, Havis gave Adams a ride home. At this time Adams showed Havis a .22-caliber pistol and offered to sell it to him for $25. Havis declined.

Another acquaintance of Adams, Donald Randall, tes-

tified that Adams came to his apartment on the morning of the murder, May 10, 1982. Adams told him he was broke and that he had to "get a hold of some money." He also told Randall that he wanted to obtain "T's and Blues," which are the street names for Talwin, a narcotic, and Piobenzamine. Adams left Randall's apartment and then returned an hour later. This time Adams asked Randall where he could obtain a gun. Randall said he did not know and told Adams, "you must want to rob somebody." Adams replied, "I just want to get ahold of some money ***. I know a place where I can get ahold of some pills." Another witness testified that he had seen the defendant in the area of Randall's apartment building that morning.

After learning of this from Randall, the police asked a part-time pharmacist of the Prescription Shop, Lynn Crammond, to ascertain whether Talwin was missing. (The store had been closed and locked following the murder.) After checking, Crammond told the police, and she later testified, that there had been Talwins in the store as of May 10, and they were now missing. She stated that no prescriptions for Talwin had been filled in the last year.

Just before or after his first visit to the Prescription Shop, Adams was seen at another store. Two employees of Alton Natural Health Foods testified that the defendant came into the store just before closing time, which was 4:30. He asked about a protein powder mix, and one employee replied that she had not heard of it. There were four or five customers in the store at the time. The defendant "stood around" for a few minutes, and then left the store.

An employee of a car wash located one block from the Prescription Shop testified that between 4:30 and 5 p.m. on the day of the murder, the defendant asked her whether she had a plastic garbage bag. She looked, but

could not find one, and Adams left.

The jury found Larry Adams guilty of both murder and armed robbery. A bifurcated sentencing hearing was held on the question of the imposition of the death penalty. In the first phase, Adams was found eligible for the death penalty, as he was found to be over 18 years of age and to have committed murder in the course of a felony. At the second phase, evidence in aggravation and mitigation was considered. The jury returned a verdict finding no mitigating factor or factors sufficient to preclude the imposition of the death sentence.

The defendant first contends that his guilt was not established beyond reasonable doubt. He says that the State's evidence largely corroborates his own version of what occurred. He says that the State's witness Howell placed him outside the store at 5:17 p.m., a time when he says Mrs. White was still talking to Ponder at the drive-up window. A reasonable hypothesis of innocence has been raised, he argues, namely, that the crime was committed after he left the store.

The question of the guilt of an accused is for the trier of fact (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360), and guilt may be shown through circumstantial evidence (*People v. Albanese* (1984), 102 Ill. 2d 54, 76).

A court of review will not set aside a criminal conviction unless the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360; *People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227.) As we stated recently in another capital case, "it is not the function of this court to retry the defendant." (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Minor inconsistencies in the testimonies do not, of themselves, create a reasonable doubt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360; *People v. Thiel* (1981), 102

Ill. App. 3d 28, 31.) Mrs. White stated that she arrived at the drive-up window at approximately 5:12 p.m., and left approximately 5 minutes later, or 5:17 p.m. Mrs. Howell saw the defendant cross the street at approximately 5:17 or 5:18 p.m. Allowing for some reasonable margin of error in time, this testimony did not, as a matter of law, create a reasonable doubt of guilt. Whether the testimony served to exculpate the defendant was for the jury to decide.

The defendant does not deny that he was in Ponder's store. In dispute is what occurred during the defendant's second visit to the store. There was evidence contradicting the defendant's account of what he purchased in the store, the manner in which he left the store, and where he went after leaving the store. Havis and Randall testified to the defendant's motives for the robbery. There is no sufficient ground to disturb the jury's conclusion that the defendant was guilty beyond reasonable doubt.

The defendant argues that at the guilt phase of the trial the prosecutor made improper comments in closing argument. We observe first that none of the comments were objected to at trial or raised in the motion for a new trial. This, of course, constitutes a waiver of the right to raise the issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) Here, even if the issue had been preserved for appeal, the comments were not reversible error.

For example, the defendant says that the prosecution referred to and misstated the reasonable-doubt standard. He argues that the prosecutor equated "beyond reasonable doubt" with "a decision *** you are confident of." The prosecutor stated:

"That is what we are talking about when we are talking about a reasonable doubt. Would you make a decision based on that facts in this cause that you are confident of. I would submit to you that the evidence is overwhelm-

ing on that case."

The defendant cites *People v. Cagle* (1969), 41 Ill. 2d 528, for support, but the holding there was simply that the trial court may not accept a jury instruction which elaborates or attempts to explain the reasonable-doubt standard. (41 Ill. 2d 528, 536.) The prosecutor here was arguing the weight of the evidence, and we cannot conclude that the defendant was prejudiced.

The defendant complains, too, of the prosecutor's comment that "you are not required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt." The prosecutor did, in fact, state almost verbatim what was said by this court in *People v. Rhodes* (1981), 85 Ill. 2d 241, 249:

> "Circumstantial evidence is generally sufficient to support a conviction if it is inconsistent with any reasonable hypothesis of innocence, but the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt."

It cannot be said that the prosecutor misstated the reasonable-doubt standard.

The next complaint of the defendant is the prosecution's argument that the fact that none of the fingerprints on the cash register were the defendant's and that there was an unidentified fingerprint on the cash register "couldn't control the defendant's guilt *** because of everything else the state has proven." The prosecutor, however, was simply arguing the weight of the evidence and not misstating where the burden of proof rested.

The defendant further contends there was error when the prosecution, on rebuttal, said that "[p]rosecutors meet the burden of proof every day." This comment, as was noted by the prosecutor at the time, was in response to defense counsel's statement that "people get

charged; people get charged who are innocent \*\*\*." The remark, too, was a general response to the defendant's repeated implications that a case based solely on circumstantial evidence is insufficient. Not only do we consider that the statement was invited by defense counsel (*People v. Vriner* (1978), 74 Ill. 2d 329, 344), but also we observe that it is not error for the prosecution to state that circumstantial evidence is sufficient for conviction. *People v. Albanese* (1984), 102 Ill. 2d 54, 76.

The defendant contends that the prosecutor made comments that amounted to expressions of his opinion as to the defendant's guilt. We note that again no objection was made and the question was waived for appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) In any event we consider that the comments were on the evidence and strength of the State's case, which is permissible. (*People v. Yates* (1983), 98 Ill. 2d 502, 532; *People v. Tiller* (1982), 94 Ill. 2d 303, 318-19.) The defendant did not object to the prosecution's reference to a well-known case in which the defendant was acquitted on the ground of insanity. On this record we consider that the comment was not serious error.

The defendant complains of prejudicial error in several other comments of the prosecutor which were not objected to at trial. We have examined these statements, which include a comment that the defendant lied and a comment that defense counsel can make "something \*\*\* look like nothing," and do not consider them to be prejudicial error. It was held that a prosecutor's saying that a defendant was lying was not error if the statement was based on the evidence (*People v. Tiller* (1982), 94 Ill. 2d 303, 318-19), and that the statement concerning defense counsel's case was a comment on the weight of the evidence and did not rise to the level of impeaching defense counsel's integrity as in *People v. Emerson* (1983), 97 Ill. 2d 487, 497. The defendant also claims error in the

statement, also not objected to, that because prosecution witness Havis "didn't get touched on cross-examination *** [t]hat's a direct admission that Adams is a murderer and an armed robber." This evidence was not, of course, an "admission" by Adams that he committed any crime because it occurred before the crimes took place. We consider that the prosecutor, though in a somewhat oblique and improper manner, intended to argue the weight of the evidence. We regard that the jury understood this, and that the comment did not prevent the jury from properly weighing Havis' testimony.

The defendant says that it was error for the prosecutor to make remarks about character qualities of the victim, such as that he was "meticulous," and an "honest businessman," and "his wife loved him enough to call him." Defense counsel objected to only one of these remarks. The references to Ponder as being meticulous and honest were taken directly from the testimony of Lynn Crammond. The witness was suggesting that Ponder would have rung up the sale of the vitamin E had the defendant made a purchase. In *People v. Bernette* (1964), 30 Ill. 2d 359, 370-73, cited by the defendant, the defendant's conviction was reversed because there was excessive reference through direct testimony and argument to the murder victim's young children. What occurred here is, of course, distinguishable.

There was error, the defendant says, when the prosecutor, on cross-examination, referred to the defendant's not leading the police to Shirley McClaine's house. That amounted, the defendant says, to a reference to post-arrest silence contrary to the holding in *Doyle v. Ohio* (1976), 426 U.S. 910, 49 L. Ed. 2d 91, 96 S. Ct. 2240. But the prosecutor did not refer to the defendant's silence; the defendant did not remain silent. He gave a written statement saying that he had gone to McClaine's house and had left the bottle of vitamin E there. The po-

lice officers' testimony was that after being asked to lead them to McClaine's house, he agreed, but later refused. At trial, he did not contradict his statement that he had left the bottle at McClaine's, but denied that he was asked to take the police to McClaine's. The cross-examination of Adams on his testimony that he did not agree to take police to McClaine's was not improper. There was testimony of his prior inconsistent statement that he did agree. *Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182; *People v. Rehbein* (1978), 74 Ill. 2d 435, 442-43.

There was error, the defendant claims, when the prosecutor, in closing argument, commented on the failure of the defense to produce McClaine as a witness, because in doing so the prosecutor impermissibly shifted the burden of proof to the defendant. It is improper for the prosecutor to comment on an accused's failure to call a nonalibi witness. (*People v. Kubat* (1983), 94 Ill. 2d 437, 497-98; *People v. Beller* (1979), 74 Ill. 2d 514, 526; *People v. Blakes* (1976), 63 Ill. 2d 354, 358-60.) Adams' defense consisted of his claim that he simply had been a customer in the store about the time of the robbery; that he purchased a bottle of vitamin E and later left it at McClaine's home. The defendant volunteered this story in his statement to the police and injected McClaine's name into his defense. Because the defendant's story was contradicted on many details, McClaine's testimony became important to his case. In *Kubat* and *Blakes*, this court referred to *People v. Williams* (1968), 40 Ill. 2d 522, 528-29, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004, and to an observation in *Williams* that is applicable here:

> "[I]f it is developed in a trial that a witness exists, presumably under the control of a defendant, who can throw light upon a vital matter, and he is not produced, certainly a jury may fairly consider that fact, and, likewise,

counsel would have a legitimate right to comment thereon." 40 Ill. 2d 522, 528.

The locating of McClaine presumably was under the control or within the knowledge of the defendant, and she could have testified to a vital matter of Adams' defense. It was not error for the prosecutor under the circumstances to have commented on the nonproduction of McClaine.

Another contention of the defendant is that he was denied effective assistance of counsel due to his counsel's conflicts of interest. His counsel was an assistant public defender, and the prosecution listed as potential witnesses a man and a woman who were then being represented in other cases by other assistant public defenders. Adams' counsel made two separate motions to withdraw as counsel, based on his office's representation of the two persons. Responding to the motions the prosecutor stated that neither person would be called as a witness, and the motions were denied. Defense counsel had argued that notwithstanding the prosecutor's declarations his investigation of the case would somehow be affected. There was, however, no showing of any actual conflict of interest. *People v. Berland* (1978), 74 Ill. 2d 286, 299-300.

The defendant complains that Havis' testimony of the defendant's inquiry about a gun and his later offer to sell Havis a gun amounted to evidence of "other crimes" that was offered solely for the purpose of showing the defendant's propensity to commit crime. "Evidence of collateral crimes, *i.e.*, crimes for which the defendant is not on trial, is inadmissible if relevant merely to establish the defendant's propensity to commit crimes." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) Evidence of this nature, however, is admissible, when relevant, to demonstrate *modus operandi*, knowledge, intent, motive, design, plan, identification, or absence of mistake. (*Peo-*

*ple v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Baptist* (1979), 76 Ill. 2d 19, 27; *People v. McDonald* (1975), 62 Ill. 2d 448, 455.) Havis' testifying to the defendant's request for a gun was part of his testimony that the defendant had told him that there was "a drugstore he wanted to rob" where the victim would be all alone and where the defendant planned on obtaining pills. This evidence related directly to intent and motive, and testimony concerning the defendant's request for a gun was relevant to the defendant's plan, because a gun was used in the robbery. In addition, it can be argued that asking to buy a gun is not of itself a criminal offense, and there was really no question of "other crimes." The evidence of Adams offering to sell Havis a gun he had in his possession, however, might be considered as an "other crime." It was defensible, however, not as showing the defendant's propensity to commit crimes, but rather to show that the defendant had access to guns, including ones similar (.22-caliber weapons) to the one used in the robbery and murder here.

The defendant argues that it was reversible error for the trial court to refuse the defendant's offered instruction on the reliability of the testimony of a narcotics addict. When prosecution witness Randall was cross-examined as to whether he was a narcotics addict, he denied being an addict. At the defendant's request, Randall exhibited his arms to defense counsel and to the jury, and denied that scratches on his arms were needle marks. The trial court refused an instruction of the defendant which read: "the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." Whether a witness is a narcotics addict affects his credibility, and for this reason the witness may be required to exhibit his arms to the jury to show the presence or absence of needle marks. (*People v. Strother* (1972), 53 Ill. 2d 95, 99; *Peo-*

*ple v. Lewis* (1962), 25 Ill. 2d 396, 398-99.) Neither *Strother* nor *Lewis* held, however, that the giving of a specific instruction on the unreliability of a narcotics addict was required. Here the jury was able to consider whether the scratches were needle marks, and this, along with other factors, as the witness' demeanor while testifying and the testimony itself, allowed the jury to assess his credibility.

The defendant next alleges a systematic exclusion of black jurors from the venire. This claim is without support in the record. Of the three black jurors that were dismissed, two were dismissed for cause. The third was peremptorily challenged after having testified that his daughter was wrongly jailed for three days for a drug offense. The prosecutor stated in the record that this was the basis for the juror's dismissal. The defendant's contention has no substance.

The trial and evidence of the defendant's guilt satisfied the standards described earlier in this opinion, and his conviction is affirmed.

The defendant contends that the prosecutor, in closing argument at the first phase of the death penalty hearing, made comments that were improper and prejudicial. The defendant, however, made no objections to these comments, and any question regarding them has been waived unless it is "plainly apparent that an error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error." (*People v. Yates* (1983), 98 Ill. 2d 502, 533.) We consider that it is necessary for a proper review of the sentence that the comments be examined.

The first phase of the sentencing hearing is to determine the defendant's eligibility for the death penalty. The State must prove beyond reasonable doubt that the defendant was over 18 years of age at the time of the offense, and that there is at least one statutory aggra-

vating factor. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b).) (The aggravating factor here was conviction of murder during the commission of a felony (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)).) This phase allows the jury to determine the defendant's eligibility free from any possibly inflammatory evidence that could improperly influence this determination.

The State did not offer any new evidence for the first phase of the sentencing hearing; the jury was instructed by the court to consider all evidence admitted during the guilt phase. Each side presented an argument, and the State closed with rebuttal comments. The defendant first claims error in the prosecutor's mention of convictions that referred to the defendant's age:

"In addition, we have People's Exhibits No. 86 and 89 which are court documents.

These are informations where he was convicted of forgery last year on May 4, 1981; and the court found that as a matter of record that last year on May 4, 1981, he was 25 years old. Again, in People's Exhibit 89 the court found on that same day that he was 25 years old."

The defendant argues that other evidence admitted at the guilt phase showed his age at the time of the offense to be over 18 and that it was irrelevant and prejudicial for the prosecutor to refer to these convictions at the first phase. The convictions, however, already had been admitted at the guilt phase of the proceeding for purposes of impeachment. The only other evidence of the defendant's age was a police statement in which the defendant admitted he was over 18. Though the defendant does not dispute that he was over 18, the prosecution had a burden to prove that the defendant was of the statutory age. Establishing that was not error.

The defendant contends next that the prosecutor committed error by commenting in his closing argument at the first-phase proceeding that the defendant would

have killed other persons if they had interrupted him in the act of robbery. He stated:

"*** if Sherry Markham had been in the store, lost her purse or Doctor Snitzer had come back for some reason when Adams was coming back up those steps we would have two murders on our hands instead of one."

We agree that the comments were improper. These comments were irrelevant. The jury at the first phase of the sentencing proceeding may be directed to consider only evidence which is relevant to the phase's statutory criteria, the age of the defendant and the aggravating factors. To have the jury consider that other persons could have been killed by the defendant on that day served to distract the jurors from their proper, limited consideration of the defendant's eligibility for the death penalty. (*People v. Davis* (1983), 97 Ill. 2d 1, 25-29.) We cannot say that there was not a real danger that the jury's imposition of the death penalty was improperly influenced.

Next, the defendant claims that it was error for the prosecutor to argue to the jury in the first phase of the sentencing hearing that Adams qualified for the death penalty because he intended to and did kill a "witness" to the crime. The prosecutor told the jury:

"It was an intentional deliberate killing. *He intended to do away with the witness*; he intended to kill him; and finally we have to show that the other felony was armed robbery.

* * *

I don't intend to belabor this phase of the hearing. I don't think there is a lot to really argue about. The Defendant was clearly over the age of eighteen. *He clearly committed the murder during the course of an armed robbery to get rid of the witness.*

* * *

It was intentional, and Adams himself pulled the trigger; and I would ask you to sign the verdict finding the aggravating factors stating that Adams not only com-

mitted murder and armed robbery but he committed in the fashion that the Legislature has said if you do it that way with the intent, if you are the person who did it, *if you do it to knock off a witness, then you qualify for the death penalty.*" (Emphasis added.)

The statutory aggravating factor that the prosecution intended to prove at this hearing to establish the defendant's eligibility for the death penalty was under section 9—1(b)(6) of the Criminal Code of 1961, which provides:

"the murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6).)

That the victim was, in a sense, a "witness" to his own killing was irrelevant to this statutory aggravating factor. Yet the prosecutor twice characterized Ponder, the murder victim, as a witness and then, in his final words to the jury, stated: "if you do it to knock off a witness, then you qualify for the death penalty." These comments called for the jury to find the defendant qualified for the death penalty based on a factor not involved in this case. There is a provision that makes the killing of a witness a factor which qualifies for the imposition of the death penalty. The provision states:

"the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the

defendant, or was an eye witness or possessed other material evidence against the defendant." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(8).)

This provision does not, however, permit the prosecution to regard the slain person not only as the victim of murder but also as a witness to the crime of his own murder as well. That is precisely what the prosecution improperly did here. The impropriety of this interpretation of the statute was decided in *People v. Brownell* (1980), 79 Ill. 2d 508, 525-26, where this court stated:

> "The court appears to have made the finding that the victim was an eyewitness upon the evidence adduced at trial—that the victim, as the subject of the aggravated kidnapping and rape, could have later testified against the defendant. We do not think this particular factual situation was intended by the General Assembly to be included within this aggravating factor. Rather, we think the General Assembly intended to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution."

These improper references to the victim as a "witness" were repeated during the second phase of the sentencing hearing.

In the second phase of the death sentencing hearing the jury considers factors in aggravation and mitigation relevant to the imposition of the death penalty. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c).) A verdict of death will be entered only if "the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(g).) During this second phase, the prosecutor argued to the jury:

> "We only submitted one factor to you because it was very clear that that factor applied, and that was that the murdered individual was killed in the course of another fel-

ony, he was killed by the Defendant, he was killed intentionally, and that he was committing an armed robbery. But there's another factor and another way that Adams qualified for falling into the category of the death penalty, and that was that the murdered individual was a witness in the prosecution or was an eyewitness or possessed other material evidence against the Defendant. Ponder, of course, was an eyewitness. So, there were actually two aggravating factors, although you only deliberated on one. Either one of which qualifies the Defendant for the death penalty."

Of course, there were not two statutory aggravating factors; Ponder was not a "witness" to his robbery and murder. (See *People v. Brownell* (1980), 79 Ill. 2d 508, 525-26.) Thus the jury was told at the second phase to weigh as an aggravating factor a circumstance that under *Brownell* was nonexistent. It had no proper relevance to either phase of the death sentencing hearing. We cannot say that the jury's deliberations and verdict were uninfluenced by the improper argument. The defendant's death sentence must be vacated and the cause remanded for a new hearing on the sentence to be imposed.

As stated above, the comments we have described were not objected to, but considering the evidence here, the serious character of the error, and that the jurors voted to impose the death penalty, we will recognize them as plain error. *People v. Stewart* (1984), 104 Ill. 2d 463, 488; *People v. Yates* (1983), 98 Ill. 2d 502, 533.

As the cause is being remanded it is appropriate to consider too the defendant's contention that certain evidence was erroneously admitted in aggravation at the second phase of the sentencing hearing. A police officer testified that in 1972, while searching an area in which an armed robbery was just reported, he saw two black men entering a car two blocks from the scene of the robbery. When the men saw him, he stated, they ran in dif-

ferent directions. He chased one of the men, caught him, and took him into custody. The man was the defendant. The officer stated that there was no evidence connecting Adams to the robbery and he was never charged with the crime. We do not consider that the conduct of the defendant in fleeing, without more, should have been submitted to the jury. The victim of the robbery undoubtedly was summoned to view the defendant after he was taken into custody. Clearly he was not identified as the robber, and the victim, so far as the record here is concerned, may even have informed the police he was certain he was not the offender. The officers' testimony should have been excluded.

For the reasons given, the defendant's conviction is affirmed and the sentence of death is vacated. The cause is remanded to the circuit court of Madison County for a new sentencing hearing.

*Judgment affirmed;*
*sentence vacated;*
*cause remanded.*