THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KEVIN WHITECOTTON, Defendant-Appellant.

Fifth District   No. 5—86—0293

Opinion filed September 30, 1987.

174

HARRISON, J., dissenting.

Bernard A. Paul, of Marion, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Kim G. Noffke, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Kevin Whitecotton, was found guilty of criminal sexual assault after a jury trial held on December 4 to 6, 1986, in the circuit court of Williamson County and was sentenced to imprisonment for a term of four years. Defendant has perfected the instant appeal in which he raises the following issues: (1) whether the trial court erred in denying his motion to suppress his confession; (2) whether the trial court erred in denying his motion that it take judicial notice of other charges complainant previously had made; (3) whether he was proved guilty beyond a reasonable doubt; (4) whether the prosecutor's closing argument deprived him of due process; and (5) whether the jury's verdict was brought about by compromise and coercion and was therefore not unanimous. We affirm.

Complainant, who was 16 at the time of the incident, testified as follows: On June 24, 1985, at approximately 9:30 p.m., she was walking near her house in Herrin, Illinois, when defendant, then age 24, and her cousin, Bobby Tolbert, then age 16 or 17, drove up behind her and asked if she wanted a ride. Complainant replied affirmatively and got in the car between Tolbert and defendant, who was driving his own car. Defendant had lived upstairs from complainant for two years. Defendant told complainant "he was going to take [her] someplace and what all he was going to do and everything," and "he was just going to take [her] out and show [her] what a good time was."

Complainant asked to be let out of the car and tried to get out at a stop sign, but Tolbert would not let her. Defendant then drove away at a high rate of speed.

Defendant drove to a dirt road alongside some railroad tracks. No one was around. Tolbert opened the door and pulled complainant out of the car while defendant released her hands from the steering wheel. Defendant then held her arms and both men undressed her. During this time, complainant was kicking at Tolbert. She was yelling until they covered her mouth.

After they had undressed her, defendant told Tolbert to go down the road. Tolbert took her clothes and defendant pushed her into the backseat of the car, unzipped his pants and held her down while he stuck his penis into her vagina. Complainant testified that she kept trying to get defendant off of her and that she did not consent to his advances.

After defendant had finished he called Tolbert back to the car. Defendant and Tolbert got in the front seat and Tolbert threw her clothes to her in the backseat. They subsequently let complainant out near Tolbert's house and drove away.

Complainant was going to tell Tolbert's mother of the incident, but changed her mind. Instead, she went into the Tolbert residence to use the bathroom and she asked to use the phone. She tried to call a friend but the line was busy. Tolbert and defendant then came in; however, they did not speak to her. Instead they went back outside. Complainant called her friend again, but the line was still busy. When complainant went outside, defendant and Tolbert were there, so she ran home.

Complainant testified she did not tell Tolbert's parents (her aunt and uncle) about the attack, because she initially was not going to tell anyone. She was scared, very upset, and ashamed of what had happened. Defendant and Tolbert had originally told her that she could tell the police about the assault if she wanted to because it was her word against theirs.

When complainant got home, her mother had visitors so she changed her clothes and went outside until they left. After the visitors had gone, she told her mother about the attack and indicated who was involved. The police were called, and they interviewed her and escorted her and her mother to the Herrin Hospital, where she was examined by a doctor.

On cross-examination, complainant testified that defendant moved out of the apartment above hers the same night of the incident. She testified that when she left home she was on her way to town to see some friends. She was wearing blue shorts with pink stripes, black panties, a pink T-shirt and sandals. She stated that she had ridden to town with defendant and Tolbert on previous occasions. Complainant denied that she was supposed to meet Victor Shade that night.

Complainant also testified that defendant and Tolbert were laughing when defendant stopped the car near the railroad tracks. She was "kind of scared because [she] didn't know what they were going to do." She couldn't get away. She admitted that her clothes were taken off without being torn. She explained that defendant held her against the car while he opened the back door, and then he pushed her in. She stated that she had her back to the car and fell into the car onto her back. Defendant told her that "if [she] didn't do what he wanted [her] to do *** he'd leave [her] there and they'd take [her] clothes with them." Complainant admitted that she was not bleeding as a result of the incident, she was not cut or torn and she did not have any bruises. She also admitted that the police were not notified until about 1 a.m.

Complainant's mother testified that complainant came home at approximately 10:30 p.m. on June 24, 1985, and was visibly upset. After their visitors had left, complainant told her mother she had been raped and indicated who the perpetrators were. She was crying. Her mother called the police.

Officer Donald Jennings of the Herrin police department testified that police received a call at approximately 1:09 a.m. He interviewed complainant's mother at her residence on the night of the incident. Officer Jennings attempted to speak with complainant; however, she indicated that she wanted her mother to speak for her at that time. She became upset and started crying when her mother started to explain in detail what had taken place. Jennings told complainant to go to Herrin Hospital to be examined and treated. Afterwards, he interviewed her at the police station. She was still visibly upset during the interview.

Dr. Frank Bleyer was serving as the emergency room physician at Herrin Hospital in the early morning hours of June 25, 1985. He examined the complainant on that date. Dr. Bleyer said it was at first difficult talking with the complainant because she was quite upset and was crying. Dr. Bleyer testified that complainant was not bleeding and she did not look like she had been struck. However, the doctor did a cervical examination and found the vaginal area to be very tender to the touch. Dr. Bleyer stated his opinion that "the pain was more than what someone would have had with consented intercourse."

Prior to calling Dennis Smith as a witness, the State moved *in limine* to prohibit questioning "as to whether or not Dennis Smith issued *Miranda* rights to [defendant]" before he was interviewed. Defense counsel moved to suppress admissions defendant made to Smith. After a *voir dire* conducted outside the presence of the jury, the trial court ruled that defendant had not been in custody when interviewed. Smith was then permitted to testify as to defendant's admissions and defense counsel was allowed to examine him regarding the giving of *Miranda* rights to defendant.

Smith, an employee at the Southern Illinois Forensic Laboratory in Carbondale, testified that he interviewed defendant at his office on June 28, 1985. Defendant was not under arrest, was free to leave if he wanted to, and was told he could terminate the interview at any time. Smith testified that defendant described to him the events of June 24, 1985. Defendant told Smith that Tolbert told complainant that they were going to rape her. When the three of them arrived at a secluded area, defendant and Tolbert began fondling her breasts. Defendant told Smith that complainant was "pretending" to get away, so they held her down while they removed her clothes. Defendant told Smith

that although complainant was struggling, she was not fighting as far as hitting, scratching or kicking. At that time defendant maintained that the act of sexual intercourse was voluntary on complainant's part.

However, Smith testified that defendant gave a second statement at that time. Defendant told Smith that defendant "had told [complainant] that either way, she was going to be plugged." Smith testified: "[H]e stated at first that he couldn't tell whether or not she wanted her clothes taken off or not; but, that as he thought about it more he realized that she did not want her clothes to be removed." Smith also testified: "[I]n his [defendant's] opinion, he felt he had raped her."

On cross-examination, Smith admitted that he had not advised defendant of his *Miranda* rights before asking him any questions.

Bobby Tolbert was complainant's cousin and had known her all his life. He testified as follows: Complainant at first refused their offer of a ride but then said, "Come back. I need a ride uptown." At first she was upset with her mother but later she was laughing. When they stopped to let her out she stayed in the car. Complainant was supposed to meet Victor Shade at a lounge. They drove to the area near the railroad tracks. Defendant told her he wanted to have sexual intercourse. Tolbert testified "she said that she would let him, but not me," because they were cousins. He testified that he thought she was willing to have sexual intercourse because "she was goin' to meet the guy that she had been goin' with and he wasn't there."

Tolbert testified that complainant was "bein' kind of girlish" when they took her clothes off, "kind of shyin' away," but then she told defendant she would have sex with him. When defendant told him to take a walk, Tolbert threw her clothes in the front seat and walked down the road. He stated he saw complainant get in the car of her own free will, without the use of force. Tolbert testified that complainant was always free to go and she didn't scream.

Tolbert testified further that, after dropping complainant off in or near town, they saw her again at his home. He stated that he saw her on the phone and that she was laughing. He heard complainant say on the phone, "I'm not afraid. I can walk home."

On cross-examination, Tolbert testified he had known defendant for nine years. Tolbert denied telling complainant that she was going to get raped, and he denied telling complainant that it would be her word against theirs. He admitted that there was a case pending against him for this same incident.

Defendant testified that he had taken Bobby Tolbert to look at a car. As they were driving through Herrin, they offered complainant a ride but she refused. However, Tolbert heard her yell that she wanted

a ride, and they backed up and she got in. Defendant testified that complainant said she was supposed to meet Victor Shade at a lounge. However, defendant assumed he was not going to be there because complainant asked to be taken to town. When asked if she wanted to get out of the car, she said no and asked to be taken to the lounge. It was then that "we told her that she was going to get plugged either way," meaning "[b]y Victor or Bob and I *** one way or the other." Defendant testified that complainant was laughing.

Defendant testified that he drove to an isolated area near some railroad tracks, where "we started talkin' to her about gettin' plugged, again, by Victor, or by Bob and I one [*sic*]." Complainant got out of the car of her own free will. Defendant testified that they were talking of sex and "she said she would with me, but not Bob, but [*sic*] it was her cousin." They did not hold her except while they were taking her clothes off.

Defendant testified that complainant did not resist or fight or scream and that complainant gave defendant her house keys to hold. Defendant related that he opened the door and complainant got in the backseat voluntarily. Tolbert walked while defendant and complainant had sexual intercourse. Defendant testified that complainant was not upset afterwards and was not crying. Tolbert came back and gave complainant her clothes back.

Defendant stated that they drove complainant to Tolbert's house. After defendant and Tolbert worked on his car for awhile, they went in the house also. They saw complainant come out of the bathroom and use the phone. He heard her say "I'm a big girl. I can walk." Defendant testified that as he drove away from Tolbert's house he saw her and she waved at him. Defendant testified that he had not used force or the threat of force and that the sexual intercourse was consensual.

On cross-examination, defendant admitted that he moved from the residence above complainant's on the day after the incident. He admitted that even though he saw complainant walking back toward her home he did not offer her a ride. Defendant denied telling complainant to go ahead and call the police because it was their word against hers.

Defendant testified that he talked to Dennis Smith on June 25, 1985, after his attorney said it was all right to do so. Defendant stated that he understood at the time that he was free to leave at any time. Defendant denied telling Smith that complainant was struggling but admitted telling Smith that they had told complainant they were going to take her clothes and leave her. Defendant also denied telling Smith that complainant was pretending to get away, denied telling Smith that perhaps she didn't want her clothes taken off, and denied telling Smith

that once he began having sexual intercourse he realized maybe she didn't consent. He denied telling Smith that "[m]aybe in the eyes of the law I raped her." He stated that he was not rough with complainant.

Bobby Tolbert's mother testified that she was at home when complainant asked to use the phone and the restroom and she heard her speak to her mother on the phone. She testified that complainant went out the door as defendant and Tolbert came in and complainant looked at them and laughed. Complainant did not say she had been raped and she did not look like she had been under stress.

Defendant's girlfriend, Linda Tolbert, who was also Bobby Tolbert's sister and complainant's cousin, testified that complainant's mother called while she and defendant were asleep the night of the incident. She testified that defendant answered the phone but stated "you have the wrong number" because "he didn't know who it was." She went to see complainant and her mother at approximately 12:30 a.m. She saw that complainant was crying but it did not appear as if she had been struck.

Donald Jennings testified in rebuttal that Bobby Tolbert gave a statement on June 24, 1985, and at first denied anything had happened. In a subsequent written statement, he conceded complainant had "refused a little bit."

After lengthy deliberations, the jury found defendant guilty of criminal sexual assault.

■■ Defendant's first contention is that the trial court erred in denying his motion to suppress his confession. Defendant contends that the State failed to prove that his statements were voluntarily made since the testimony indicated that he had not been advised of his *Miranda* rights before he answered questions. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

We would first note that the protections afforded by the decision in *Miranda* are not implicated in cases involving noncustodial circumstances, even if the defendant is already a suspect in the police investigation. (*Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.) In the case at bar, defendant understood that he was free to terminate the interview at any time and was free to leave. He had consulted his attorney prior to the interview. We conclude that defendant's interview was not the coercive environment that the decision in *Miranda* sought to protect against. Furthermore, we note that article I, section 10, of the Illinois Constitution does not impose any higher standard than the fifth amendment to the United States Constitution. U.S. Const., amend. V; Ill. Const. 1970, art. I, sec.

10; *People v. Schmoll* (1979), 77 Ill. App. 3d 762, 764, 396 N.E.2d 634, 636, *cert. denied* (1980), 447 U.S. 928, 65 L. Ed. 2d 1122, 100 S. Ct. 3026.

■ We also note that, while the record indicates that there were apparently interviews with defendant on two different dates, June 28, 1985, and July 25, 1985, the statements described by Dennis Smith at trial, according to his and defendant's testimony, were given on June 28, 1985. Since the charges against defendant were filed on July 1, 1985, no sixth amendment right to counsel is implicated. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) Therefore, we conclude that the trial court properly denied defendant's motion to suppress his confession.

■ Defendant's next contention is that the trial court erred when it denied his motion that the court take judicial notice of other charges that complainant previously had made. Defendant contends that the trial court erred in not taking judicial notice of two cases in the circuit court of the First Judicial Circuit in Williamson County.

During the questioning of Officer Jennings, defense counsel attempted to elicit testimony that Jennings knew the complainant because complainant previously had accused Gregory Shoemake of sexual crimes. During defendant's offer of proof, defense counsel stated the charges were made in the fall or winter of 1984 and that the charges "were found to be unfounded, found to be without merit." The court sustained an objection to the questioning. Defense counsel attempted to question Officer Thomas Horn concerning the same subject matter and presented the same offer of proof. The State's objection to this line of questioning was also sustained.

Just before the defense rested its case, defense counsel stated to the court that he had subpoenaed Gregory Shoemake to testify, but that Shoemake was not at the courthouse. He asked for a continuance and asked the court to take judicial notice of the two cases previously referred to. The court noted that the two cases were prosecutions for battery and harassment by telephone and that the charges were subsequently dropped. According to defense counsel, "said charges have, in these two cases, been unfounded [*sic*] and are invalid."

Defendant urges that "[n]otice should have been taken which would have the double effect of: (a) impeaching the credibility of the complainant's testimony, and (b) strengthening the defendant's defense theory of consent, followed by a false accusation of rape."

We are not confronted with the question of whether Shoemake's testimony, if as described by defense counsel, would have been admissible. See *People v. Gorney* (1984), 121 Ill. App. 3d 260, 262-64, 459

N.E.2d 347, 349-51 (error to exclude testimony of victim's "proclivity for making false claims of rape"), *rev'd on other grounds* (1985), 107 Ill. 2d 53, 60-61, 481 N. E. 2d 673, 676 (evidence of prior false accusations of rape by the victim may have been admissible, but harmless error).

Instead, we are called upon to decide whether the court records in the previous two cases were a proper subject for judicial notice for the purpose proposed by defendant. We conclude that under these facts, judicial notice would have been improper.

Judicial notice may be taken where the facts are "readily verifiable from sources of indisputable accuracy." (*People v. Davis* (1976), 65 Ill. 2d 157, 165, 357 N.E.2d 792, 796.) "However, where the facts are derived from pleadings in a case not involving the same parties and are not proved, judicial notice is improper." *Vulcan Materials Co. v. Bee Construction* (1983), 96 Ill. 2d 159, 166, 449 N.E.2d 812, 815.

■ In the case at bar, the prior court records did not involve the same parties. Furthermore, in the absence of unusual documents or statements in those court records, the fact that the previous charges against Shoemake were dropped does not prove the falsity of those charges. Therefore, we conclude that the denial of defendant's motion that the court take judicial notice of prior proceedings was proper.

■ Defendant also contends that he was not proved guilty beyond a reasonable doubt. He urges that the trial court erred in denying his motions for directed verdict of acquittal and his motion for judgment *n.o.v.* because the State failed to prove that defendant "used force in any degree to accomplish the sexual penetration" and the State "produced no physical evidence at trial to show that any degree of actual force or any threat of force was used by defendant before, during or after the act complained of."

Criminal sexual assault is defined in the Criminal Code of 1961 (Code) as follows:

"(a) The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force ***." (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).)

Section 12—12(d) of the Code states:

" 'Force or threat of force' means the use of force or violence, or the threat of force or violence, including but not limited to the following situations:

(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to

execute that threat; or

(2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(d).)

Since defendant concedes that sexual intercourse occurred, the only issue is whether the sexual penetration was by the use of force or threat of force.

We need not restate all the evidence supporting the jury's verdict. Complainant testified that she asked to be let out of the car and she tried without success to get out of the car. She testified that she resisted getting pulled out of the car, that she kicked at Tolbert and she screamed and that she was being held while her clothes were removed. She further testified that she kept trying to get defendant off of her. This evidence was sufficient to prove that defendant overcame the complainant by the use of force and by physical restraint. Ill. Rev. Stat. 1985, ch. 38, pars. 12—12(d), (d)(2).

Furthermore, Dr. Bleyer testified that it was his opinion based on his examination that the intercourse was not consensual.

Finally, Dennis Smith testified that defendant admitted to him that he and Tolbert restrained complainant while they removed her clothes, that she was struggling, and that defendant felt like he had raped her. Donald Jennings testified that Tolbert admitted that complainant had "refused a little bit."

■■ When a reviewing court is confronted with a challenge to a sufficiency of the evidence, it is not its function to retry the defendant. In *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, our supreme court stated:

"As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." (106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.)

We conclude the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

■ Defendant's fourth contention is that the prosecutor's closing argument violated his right to due process. The statements complained of are as follows:

> "[Assistant State's Attorney]: Leave the questions in your mind why did someone just drive past the girl he had just, supposedly, had love with. The question in your mind of why would someone have sex with her, not taking her panties off all the way so that there was some material on her panties and not even taking off his own clothes, if it was love."

Later, the prosecutor stated:

> "I have call [sic] him a man hesitantly, because what he did that night was not the action of a man, but was nothing more, that night, than an animal."

Defendant urges that the prosecutor's use of the word "love" confused the jury as to the elements of the offense and inflamed the passion of the jury. We disagree. The prosecutor used the word "love" as a synonym for consensual intercourse and we find no error.

■ While the reference to the defendant as an animal was unwarranted, it was an isolated comment which could not have contributed to the jury verdict.

Improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused or constitute a material factor in the conviction. The test is whether the jury would have reached a contrary verdict if the remarks had not been made. (*People v. Evans* (1979), 80 Ill. App. 3d 444, 455-56, 399 N.E.2d 1333, 1342, *cert. denied* (1980), 449 U.S. 951, 66 L. Ed. 2d 215, 101 S. Ct. 354.) We conclude that the prosecutor's remarks do not constitute reversible error.

Moreover, we note that defendant did not object when the comments were made and did not include the issues in his post-trial motion and that, as a consequence, the issue could be considered waived. *People v. Adams* (1985), 109 Ill. 2d 102, 116-18, 485 N.E.2d 339, 343-44.

■ Lastly, we consider defendant's contention that the jury's verdict was brought about by compromise and coercion and was therefore not unanimous. Defendant urges that the length of deliberations indicates that he was deprived of a fair trial.

The relevant facts are as follows: The jury retired to deliberate at 2:05 p.m. on December 5, 1985. At 7:40 p.m., the court met with both attorneys and defendant and stated that he had received a note from the jury bearing a time of 6:34 p.m. The note stated: "We have taken a poll on the verdict and cannot reach a unanimous verdict. We need further direction." The prosecutor suggested that the jury be told to con-

tinue deliberating. Defense counsel suggested a mistrial. The court instructed the jury to continue their deliberations.

At 11 p.m. the court received another note from the jury which stated: "Judge Howerton, still deadlocked. Shall we continue? Possibility for a unanimous decision appear [sic] nil." The prosecutor suggested that the jury continue, but also suggested having the jury come back the next morning. Defense counsel requested a mistrial or, in the alternative, the giving of a *Prim* instruction. (See *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The court gave the jury a *Prim* instruction whereby the jury was again instructed as to the nature of its duties and was told that it was the duty of the jurors to deliberate with a view to reaching a verdict but that they need not surrender their honest conviction as to the weight or effect of evidence.

At 2:35 a.m. the jury asked for coffee and asked that their relatives be informed not to worry.

At 3:07 a.m. the court received two notes, one requesting a dictionary, one asking, "Can we be dismissed for the evening." The prosecutor recommended a recess, while defense counsel requested a check to see if the jury was deadlocked and if so, a mistrial. Defense counsel objected to the providing of a dictionary and the court refused the jury's request. However, the court called the foreman in and the following colloquy took place:

> "THE COURT: Do you believe that if you continued to deliberate tonight you could arrive at a verdict?
>
> MR. PAHL [Foreman]: Yes.
>
> THE COURT: Do you believe that if you were dismissed for the evening and returned tomorrow morning you could arrive at a verdict?
>
> MR. PAHL: Yes.
>
> THE COURT: Are you close enough to a verdict that you believe that if you continued to deliberate until some three or four hours from now that you could reach a verdict?
>
> MR. PAHL: Yes.
>
> THE COURT: Do you believe that it would be in the best interest of the jury if it continued to deliberate this evening?
>
> MR. PAHL: Yes, I do."

The jury returned to deliberate and, at 7:10 a.m., the jury returned a verdict of guilty. Both attorneys declined to poll the jury.

As part of his post-trial motion, defendant presented affidavits of three jurors. Each affidavit, in effect, stated that the individual juror had been holding out for a not guilty verdict but because of fatigue changed his or her vote. Each juror stated that he or she felt defend-

ant was not guilty. The affidavits were dated December 10, December 12 and December 31, 1985.

It is well settled, however, that under the circumstances of the case at bar, the affidavits cannot be considered. The use of affidavits or testimony to show " 'the motive, method or process by which the jury reached its verdict' " is not permitted. *People v. Preston* (1979), 76 Ill. 2d 274, 288, 391 N.E.2d 359, 365-66, quoting from *People v. Holmes* (1978), 69 Ill. 2d 507, 511, 372 N.E.2d 656, 658. See *People v. Evans* (1979), 80 Ill. App. 3d 444, 461, 399 N.E.2d 1333, 1345-46, *cert. denied* (1980), 449 U.S. 951, 66 L. Ed. 2d 215, 101 S. Ct. 354.

■■ Furthermore, the length of time that is reasonable to allow a jury to continue deliberations is a matter for the sound discretion of the trial court, and its judgment will not be disturbed unless the discretion is shown to have been clearly abused. (*People v. Evans* (1979), 80 Ill. App. 3d 444, 459, 399 N.E.2d 1333, 1344, *cert. denied* (1980), 449 U.S. 951, 66 L. Ed. 2d 215, 101 S. Ct. 354.) In the case at bar, the trial court allowed the jury to deliberate for approximately nine hours before the giving of the *Prim* instruction. The jury did not again report a deadlock. Furthermore, at 3:07 a.m., four hours after the jury received the *Prim* instruction, the foreman explicitly indicated his opinion that a verdict could be reached in a few hours and that it was in the best interests of the jury to continue deliberating without a recess. Under these circumstances we conclude that the trial court did not abuse its discretion and that defendant was not deprived of a fair trial.

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

KARNS, P.J., concurs.

JUSTICE HARRISON, dissenting:
I believe that the trial court abused its discretion when it caused the jury to deliberate for over 17 straight hours until 7:10 a.m. I therefore dissent.