THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID B. PRUITT, Defendant-Appellant.

Fifth District   No. 5—85—0443

Opinion filed March 31, 1987.

Randy E. Blue and Patricia M. Sarter, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Dick Allen, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

A jury found the defendant, David B. Pruitt, guilty of murder. The trial court sentenced him to a term of 30 years' imprisonment. He appeals, presenting seven issues for review: (1) whether the evidence was sufficient to support a verdict of guilty beyond a reasonable doubt for the offense of murder; (2) whether, if the defendant was responsible for the death of the decedent, his conduct constituted only voluntary manslaughter; (3) whether the court erred in allowing testimony in violation of the marital communication privilege regarding a statement allegedly made by the defendant to his wife, Sharon Pruitt; (4) whether the trial court erred in refusing to give the second paragraph of the circumstantial evidence instruction; (5) whether the court erred in giving People's instruction No. 14, a non-IPI (Illinois Pattern Jury Instructions, Criminal, (2d ed. (1981)) (hereafter referred to as IPI Criminal 2d) instruction on the use of a prior inconsistent statement as substantive evidence; (6) whether the defendant was denied his right to a fair trial "when the prosecutor misstated the law and told the jury to disregard the instructions on voluntary and involuntary manslaughter during closing argument"; and (7) whether a sentence of 30 years' imprisonment imposed upon the defendant, a first-time offender, is excessive and an abuse of discretion. We affirm.

At trial witnesses for the State testified that the body of the victim, Bryan Keeney, a police officer with the Fairmont City police department, was found at 6:30 a.m. on November 4, 1984, lying on its back beside his squad car on the grounds of the Cahokia Mounds State Park (park). The squad car was facing south, its lights on and engine running. The door on the passenger's side was open, whereas

the door on the driver's side was closed. The body of the victim was lying parallel to the squad car with its head to the south and feet to the north. A spent projectile that had, according to the ballistics expert, been fired from the gun borrowed by the defendant on the date in question was found on the ground about 202 feet south of the squad car at about 3:47 p.m. that same day. The projectile, which was "jacketed" with copper and tested positive for the presence of blood, could not, according to the expert, have been fired from any other weapon. The ammunition found in the victim's service revolver, still in its holster, was not jacketed. The victim's service revolver was a Smith and Wesson .357 Magnum, Model 66. The victim's uniform was orderly. Blood matching that of the victim was found on the inside of the door on the driver's side of the squad car and near the edge of the driver's seat next to the door on the driver's side; some blood had run onto the floor of the backseat on the driver's side and had pooled there. There was a large amount of blood on the pavement near the victim. Spots and streaks of blood were found on the outside of the door on the driver's side and on the roof and trunk of the car. Analysis of the blood of the victim, the defendant, and the defendant's wife revealed that the blood on the roof of the car was consistent with that of the victim but could not have come from either the defendant or his wife. There was no testimony concerning the source of the spots of blood found on the trunk of the squad car. No blood was found on the front seat on the passenger's side or on the backseat of the squad car. The fingerprints of the defendant were found on the outside of the squad car, and those of his wife were found on both the inside and the outside of the car.

The pathologist who performed the autopsy stated that the entrance wound was located slightly to the left of the midline of the victim's forehead and the exit wound was in the left occipital area at the back of the head. The path of the bullet that caused the victim's death was from the left forehead "slightly downward" and to the left. Three small metal fragments were found in the brain of the victim. The cause of death was a "contact gunshot wound to the forehead and damage to the brain." A contact wound is one in which the barrel of the weapon is in contact with the skin of the victim. The site of the entrance wound of the victim here was devoid of powder residue, and the entrance wound was star-shaped with irregular edges, indicative of a "tight" contact wound, in which no powder residue is present on the skin about the wound, the powder residue having been carried under the skin.

On the date in question the defendant was employed as a night-

time security guard working in East St. Louis. For purposes of his employment he carried a Smith and Wesson .357 Magnum, Model 586, revolver, borrowed from his father, David J. Pruitt, who at the time was employed as a police officer by the Fairmont City police department. No ammunition was in this weapon when it was seized by police from the defendant's father on the morning of November 4, 1984, after the defendant's wife had returned it to his father. Lt. Salvador Mora, who had worked with the victim as a policeman for three years, testified that he had never known the victim to carry any weapon other than his service revolver.

The defendant called as a witness his wife, Sharon Pruitt, who testified on direct examination that she and the victim had had an ongoing sexual relationship since May of 1984 and that after midnight on November 4, 1984, while driving she met the victim on the parking lot of the Venture store in Fairmont City. The two drove in separate cars, he being in his squad car, to the park, which was, the testimony showed, outside of the jurisdiction of the Fairmont City police department although the victim was on duty at the time. At the park they talked while still in their cars. The witness stated that her car was about a foot from the squad car, facing in the opposite direction; the window of the door on the driver's side of each car was down so that the two could converse. After about 20 minutes, she got into the front seat of the squad car on the passenger's side. He placed a revolver, which he had on his person at his back, and a flashlight on the dashboard. The victim remained fully clothed, although the witness was in a state of partial undress when she observed her husband drive into the park, stop his car, and approach the squad car on foot. The victim got out of the squad car and closed the door; she opened the door on the passenger's side. She indicated that when her husband got out of his car, she "grabbed the gun that was on the dashboard to prevent anything—try to prevent anything from happening." She said the defendant "grabbed my right arm" and the victim "grabbed for the gun with—and he had my hand." The victim and the defendant were, she said, both pulling on her. The dome light was not on. "The gun went off and I dropped it and Bo [defendant] continued to pull me out of the car," whereupon she landed on the ground. She described the victim as having "both arms in the window." He was, she said, "leaning into the car" and had "slumped on the open window of his car." She stated that the defendant touched the victim on the shoulder and told him to get up and that the body then slumped to the ground. She got into her car through the open window, the defendant lifted the victim's arm with his foot so that she could drive away, and she did

so. She said that after washing her car at her home, she returned to the scene at about 3 a.m. to retrieve her coat, which she had left in the squad car. When she took the jacket, she said, she took the gun that had been placed on the dashboard as well and, while driving over a bridge, threw the gun out the window on the passenger's side into the Mississippi River. After her husband finished working at 6 a.m., they returned to the scene at about 6:30 a.m. and arrived home at about 7 a.m., where her husband removed the bullets from the gun, placing them in a cup. She attempted to return the gun to his father, but, finding that his parents had not yet arisen, she washed her car at a car wash, returning the gun to his father later that morning. She said that after having spent three days in jail concerning the homicide, she removed the bullets from the cup at her home and took them to the defendant's father.

On cross-examination the witness stated that she had given the police three statements under oath in the case: "I gave one when I was arrested. I gave one to get out of jail. And I gave the truth, the last one." On November 4, 1984, at about 12:15 p.m. she gave a signed statement under oath to police in which she said, *inter alia,* that about a month earlier her husband had found her and the victim together at the park. She stated that she had met the victim at the Venture store in Fairmont City at about 12:15 a.m. and had talked with him in his squad car until about 12:45 a.m., when she left. According to that statement, she had not seen the victim thereafter. She was arrested around midnight on November 5, 1984, for obstructing justice and was transported to jail by Deputy Arnotti of the Madison County sheriff's department. Asked, "And you don't remember telling him that they were trying to pin a murder on me that my husband committed?" she answered in the negative. The witness testified that, in the presence of her lawyer, she had given another written statement under oath on November 6, 1984, in exchange for immunity from prosecution on charges related to the homicide. In this statement the witness said that she had followed the victim in her own car to the park, arriving there at about 12:30 a.m. She was in a state of partial undress when her husband approached in his car. Her husband stopped his car in front of the squad car, and she got out of the car. Her husband, she said,

> "grabbed me by the hair of the head and threw me on the ground. He was calling me all kinds of names like slut and whore. I have never seen him like that before. He was very hostile. He had his gun out of his holster and in his hand. Bo walked around the back of Bryan's car and came up to him on

the driver's side. Bo still had the gun in his hand. I could see Bo from his hips up but could only see Bryan from the neck up because of the car."

She continued her account in this statement by saying:

"I heard Bo tell Bryan to take his gun belt off. Bo was yelling at Bryan about us being together. Bryan was trying to calm him down. I heard Bryan tell Bo there was no need for a gun and to put it away. Bo still had the gun in his hand. I was looking at Bryan. I heard a shot. I didn't see Bo pull the trigger. Bryan fell into his car, and when Bo touched him, he fell to the ground. I started screaming. Bo told me to get in my car."

At trial the witness asserted that this account was false, given for the purpose of obtaining her release from jail. She admitted that on January 14, 1985, during a conversation with Agent Bivens of the Illinois Division of Criminal Investigation, she had stated that she had not removed any weapon of any kind from the scene or seen anyone else remove one. At trial she stated that she had not been truthful on that occasion or in the giving of the prior statements set forth above.

On March 20, 1985, the witness gave another written statement under oath concerning the events of November 4, 1984, given, she indicated, in order to clear her conscience. In this statement the witness said that she and the victim had driven to the park, where she got into the squad car. While they were fondling one another, she said, he "took his service revolver and flashlight and put them on the dashboard." At trial she said that it was not his service revolver that he placed on the dashboard but another gun that he was carrying, which he removed by reaching behind himself with his left hand. She testified at trial that the part of the statement referring to the service revolver was not true. His service revolver remained in its holster on his person, she said at trial. About 2:15 a.m., according to the statement, her husband drove into the park. The account she gave in this statement of how the shooting occurred was essentially like the one she gave on direct examination at trial. She said that she reached for and clasped the gun on the dashboard because she "wanted to keep the gun away from Bryan because I was afraid he would use it to shoot Bo." She said the victim "reached inside and grabbed my left hand. I had the gun in that hand holding it by the butt. Then Bryan reached in with his other hand. He was inside the driver's side window up past his shoulders. His head was inside, too." She stated further, "Bryan kept pulling on my hand and the gun went off. Bryan was hanging inside of the car." When he fell his head was inside the car; when the defendant touched his body, he fell to the ground. She

drove from the scene to her home, where she washed blood from her car. At about 3 a.m., according to the statement, she returned to the scene for her coat, which she retrieved from the squad car. In this statement the witness said, "When the gun went off, I dropped it on the seat. I heard a clunk noise. I don't know what happened to it after that." She testified at trial that she had not told anyone she had thrown the gun in the river until "[a] couple of days" earlier and indicated that she had forgotten to include in the statement of March 20, 1985, the fact that she had disposed of the gun. In the statement of March 20, 1985, she said, "Later that morning, Bo made a statement that he had fired his gun but he didn't say where." On redirect examination she seemed to indicate that six bullets were removed from the defendant's gun. She maintained that the account given by her at trial was the true account of the circumstances of Bryan Keeney's death.

Robert Stephenson, who is a private investigator and an acquaintance of the victim and friend of the defendant's family, testified for the defendant that the victim carried a snub-nosed .357 Magnum in his belt at the back and that the only ammunition he used was a .357 Magnum jacketed hollow point.

The defendant called as a witness the pathologist who had performed the autopsy, Lii-Mei Beverly Tsai, who had testified earlier. On cross-examination she testified that if the victim were shot while his head and shoulders were in the automobile, the blood spatter inside the vehicle would have occurred not as it actually occurred but near the center of the automobile. Blood would not, she said, have splashed out onto the roof of the car, as depicted in a photographic exhibit, if his head and shoulders were inside the vehicle when he was shot. Asked about a more plausible explanation for the location of the blood as depicted in the photographic exhibits, which are included in the record on appeal, the witness stated:

> "All right. I'm not going to make this as a judgment or a definite thing, but it's my opinion and my thinking—I would think the person have [sic] to be at least a half out of the car, at least, and it's kind of maybe a little bit shorter than the person having the arm, and he was shot there, and so some blood splash out on the outside of the car, and brain, brain tissue and the blood drain out from the exit wound to the outer corner of the passenger seat."

The defendant called as a witness his father, David J. Pruitt, who testified that he was a former police officer for the Fairmont City police department and that he had worked two nights each week with

the victim for a period of time. The witness stated that the victim carried two .357 Magnum guns, one being his service revolver and the other what the victim called a "throw-away" gun, which was a snubnosed pistol that he carried at the back of his belt. He had seen the victim wearing the "throw-away" gun at 10:30 p.m. on November 3, 1984, while they were working together. The ammunition used by the victim in his service revolver was, the witness said, .357 Magnum "jacket hollow point." The witness testified that he had loaned 18 bullets to the defendant, apparently solid lead round nose, or ordinary, bullets of which eight had been returned. Of the eight, Sharon Pruitt returned six on the morning of November 4, 1984, after she had returned the borrowed gun empty earlier that morning and after police had taken the empty gun from the witness. When Sharon Pruitt got out of jail, she brought him two more shells she said she had found in her home, for a total of eight. The witness testified further that the gun in question had not been fired recently because he could not smell gunpowder, the odor of which lingers about a gun for approximately 12 hours after a gun has been fired.

Testifying in his own behalf, the defendant, 22 years of age at the time of trial in May of 1985, stated that he had left his place of employment in East St. Louis in search of his wife at 2 a.m. on November 4, 1984, arriving about 15 minutes later at the park, where he had found his wife and the victim together about three weeks before. When the defendant arrived, the victim got out of the squad car and the passenger door opened. The driver's door was closed. While the defendant was near the door on the passenger's side, he and the victim had some words. The defendant reached "down to grab my wife, and when I grabbed her he went down—he ducked down. I didn't see him no more, and when I grabbed my wife's arm and tried to pull her out of the car she wouldn't come out." As he pulled her, she seemed to be pulled from the other side as well. When he heard the shot, "[s]he come out easily. She come towards me real easy." He went around the back of the car to the front and found the victim "laying in his window" with both hands inside the car. When the defendant touched the victim on the neck, he fell to the ground, at which time "I heard a lot of like water running, a lot of it, and that's when I guessed what was going on," that is, that the victim had been shot. He described the victim as having been "halfway in" the car. The defendant returned to work shortly before 3 a.m. and worked until 6 a.m. He denied having fired a shot at the scene or having fired his gun at all on that date. On cross-examination he stated that initially he told the police he was not present when the incident occurred.

Later, he apparently told police that he and his wife were, in fact, present when the shooting occurred but that he did not shoot the victim.

In rebuttal Mark Cronovich, chief of police of the Fairmont City police department, testified that he had never seen the victim with a second gun. Dee Heil, a crime scene technician with the Illinois Department of Law Enforcement, testified that the bullets found in the victim's service revolver and in a briefcase in the backseat of the squad car were semi-wadcutter bullets, not jacketed hollow point ones. Agent Cruse, with the Illinois Division of Criminal Investigation, testified that on November 5, 1984, at 1 a.m. he had advised Sharon Pruitt that the investigation indicated some discrepancies in the statement she had given the police. He described her response as follows:

> "She didn't want to answer any questions. I then told her, she still maintained her original story that she had given to some of the other agents was accurate as far as her whereabouts. I then told her that we had obtained information that she had been present at the scene when the shooting took place, that she was there with Officer Keeney when her husband arrived, there was some type of altercation and the shooting. She only replied, that's about the way it happened, and at that point requested an attorney."

On cross-examination Sharon Pruitt had denied having made that statement. Agent Bivens testified that on January 14, 1985, in the presence of her attorney, Sharon Pruitt had mentioned a "drop gun" that the victim had had, which she described as a .38 special snubnosed revolver. At trial during cross-examination she was unable to describe the "drop," or "throw-away," gun with any particularity. Deputy Arnotti testified that while he was transporting Sharon Pruitt to jail on November 5, 1984, although he was not interrogating or interviewing her, she made certain statements to him spontaneously as follows:

> "Then she said, she began telling me her—she and Bryan Keeney, I believe the officer's name was, had been having an affair for quite some time, and on the previous night's occasion she and Officer Keeney had met at—behind Cahokia Mounds museum. She stated that they were inside—that they were behind the museum when her husband pulled up. There was an argument between Keeney and Pruitt, and she said she heard some gunshots, and then she fled the scene."

He testified further that "[w]hen she first got in my squad car I be-

lieve she said she was trying to pin—they were trying to pin a murder on her that her husband had committed."

With respect to the first issue presented for review, that is, whether the evidence was insufficient to support a verdict of guilty beyond a reasonable doubt for the offense of murder, a court of review will not set aside a criminal conviction unless the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Further, it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn thereupon. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402.) In the instant case, the jury plainly disbelieved the account given at trial by the defendant and his wife to the effect that the shooting of the victim was accidental as he reached into the squad car for the "throw-away" gun. The physical evidence, particularly the nature of the wound as a tight contact wound, the location of the spent projectile fired from the defendant's borrowed gun, and the location of the victim's blood as it was found in and about the car, supported the jury's verdict as did some of the statements made to police by the defendant's wife but declared by her at trial to have been false. The physical evidence together with the testimony of the pathologist suggested that the victim was shot by the defendant with the barrel of the weapon touching his forehead as he stood outside the squad car near the door on the driver's side and that, once shot, he appears to have slumped against the open window of the squad car before falling to the ground. Under the circumstances we would be remiss in our function as a court of review were we to set aside a guilty verdict based on such evidence.

Concerning the second issue the defendant presents for review, whether, if the defendant was responsible for the death of the decedent, his conduct constituted only voluntary manslaughter, as the State points out, the offense of voluntary manslaughter is an acknowledgement by the law of the mitigating effect of human weakness and intense passion in an otherwise unjustified homicide. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358.) The offense of voluntary manslaughter has been described as " '[a]n intentional homicide committed in a sudden rage of passion engendered by adequate provocation, and not the result of malice conceived before the provocation.' " (83 Ill. 2d 411, 420, 415 N.E.2d 358, 363.) The sufficiency of the provocation to cause sudden and intense passion is a matter to be determined by the trier of fact. (*People v. Stowers* (1971), 133

Ill. App. 2d 627, 273 N.E.2d 493.) The jury's verdict indicates that it considered the provocation here to have been insufficient to reduce the offense to voluntary manslaughter. Such a conclusion is particularly understandable in view of the fact that in his account of the circumstances of the death of the victim, the defendant did not indicate that finding his wife together with the victim as he had done had provoked him to shoot the victim but, rather, indicated that the victim had been shot accidentally by someone other than himself. Accordingly, we find no basis on which to disturb the jury's verdict.

■■ With regard to the third issue raised by the defendant in his appeal, whether the trial court erred in allowing testimony in violation of the privilege against disclosure of confidential communications between a husband and wife, the defendant refers to the State's reading, over defense objection, of the following statement made by the defendant's wife on March 20, 1985: "Later that morning Bo made a statement that he had fired his gun, he didn't say where." As we have indicated, the statement was read during the State's cross-examination of this witness. The defendant maintains that the statement attributed to defendant was highly prejudicial to him because it was

> "the only time that the jury heard evidence of any admission on the part of the defendant that he had fired his weapon. It is very possible that the jury, hearing that the defendant fired his gun, thought that this was an admission that the defendant killed Keeney rather than that Keeney was killed accidentally while struggling with Sharon Pruitt for a gun."

In *People v. Godsey* (1978), 57 Ill. App. 3d 364, 373-74, 373 N.E.2d 95, 102-03, *rev'd on other grounds* (1978), 74 Ill. 2d 64, 383 N.E.2d 988, the court observed:

> "[A] party may call his or her spouse as a witness. (Ill. Rev. Stat. 1975, ch. 38, par. 155—1.) In so doing the party waives the right to claim spouse privilege to prevent the spouse from testifying. But, although we have no exact Illinois case for authority, the witness spouse apparently has three choices once upon the witness stand: (1) proceed to testify except as to confidential communications during marriage [citations]; (2) in a criminal matter, claim fifth amendment constitutional right; or (3) claim witness spouse privilege to refuse to testify for or against the party spouse as to confidential events or matters of occurrence during marriage (unless the statutory exceptions are in force) [citation]. As a matter of practical jurisprudence, the party calling the spouse witness will expect proper cross-examination as to all matters of testimony elicited on direct ex-

amination as well as questions to show bias or interest of the witness."

Later, in reliance upon *Godsey*, the court in *People v. Fritz* (1979), 77 Ill. App. 3d 1, 395 N.E.2d 736, *rev'd* (1981), 84 Ill. 2d 72, 417 N.E.2d 612, in which the trial court had ruled that the spousal privilege had been waived when the wife took the stand to testify for the defendant, stated that the wife's taking the stand to testify waived merely the right to prevent one's spouse from testifying and that it did not waive the defendant's objection to the State's improperly eliciting a confidential communication. In *Fritz* the defendant contended that it had been improper to allow the State to cross-examine the defendant's wife about certain conversations between her and the defendant since the conversations had fallen within the marital privilege. The court in *Fritz* found the privilege to have been violated but that the defendant had not been unduly prejudiced thereby. The supreme court agreed with the appellate court that the marital privilege had not been waived when the defendant's wife took the stand and that the privilege had been violated by the examinations she was compelled to undergo but disagreed with the appellate court that no prejudice had resulted. In its brief in the instant case, the State refers to numerous instances during the course of Sharon Pruitt's testimony in which she referred to confidential communications made to her by the defendant. However, we need make no determination as to whether the spousal privilege was violated or waived, because any error generated by this single remark was necessarily harmless in view of the evidence presented by the State, which requires no reiteration, and other statements of Sharon Pruitt, properly admitted, which, if believed by the jury, were highly damaging to the defendant.

The fourth issue defendant presents for review, whether the trial court erred in refusing to give the second paragraph of the circumstantial evidence instruction, IPI Criminal 2d No. 3.02, has been effectively resolved against the defendant by the supreme court's recent decision in *People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413, in which the court concluded that the second paragraph of IPI Criminal 2d No. 3.02 should no longer be used.

■ In the fifth issue, in which the defendant contends that the trial court erred in giving People's instruction No. 14, a non-IPI instruction on the use of prior inconsistent statements as substantive evidence, he does not quarrel with the content of the instruction but maintains that the use of the instruction "served to highlight Sharon Pruitt's prior inconsistent statement [sic] and to make this evidence stand out from the other evidence in the case," so that the giving of

the instruction constituted an abuse of discretion by the trial court. While a trial court "should be particularly hesitant to allow non-pattern instructions, especially where the instruction may call particular attention to certain portions of the evidence" (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 569, 444 N.E.2d 609, 622, *cert. denied* (1983), 464 U.S. 841, 78 L. Ed. 2d 130, 104 S. Ct. 136), one superfluous or misleading jury instruction does not necessarily require a reviewing court to reverse. In the instant case error, if any, in this regard, as in *Vanda*, was relatively minor. In light of the nature and number of Sharon Pruitt's prior inconsistent statements in conjunction with the other evidence in the case, we think that the result would have been no different had the instruction in question not been given and any error that might have been occasioned by the giving of the instruction could have been harmless at most.

■ The sixth issue presented for our review involves remarks made by the prosecutor during rebuttal in closing argument. The issue is raised for the first time on appeal, no objection having been made to any of these comments during trial, in the defendant's written post-trial motion, or at the hearing on that motion; the issue is therefore waived for review. (*People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339; *People v. Anderson* (1981), 95 Ill. App. 3d 492, 420 N.E.2d 830.) The first of the two rather lengthy remarks to which the defendant now objects was made by way of response to defendant's closing argument and by way of inference drawn from the evidence. As such, even if the issue were not waived for review, the first of these remarks would not have constituted error.

We set forth the second of the two remarks in full:

"I want to caution you on one other matter. The Court will instruct you as to the law that applies in this case. You will be getting instructions on the offense of murder, on voluntary manslaughter, and on involuntary manslaughter. The State is asking you today to consider the evidence as presented as it relates to the offense of murder. I am asking you to return a verdict of guilty to that offense. The other two instructions that you will receive in reference to voluntary and involuntary manslaughter do not fit the facts presented to you in this case. They are totally different theories and do not fit the theory of the State and the evidence that has been presented to you from the exhibits and the witnesses and should not be considered by you in your deliberations. In returning your verdict it is important that if you find from the evidence that the offense of murder has been proved, that you not sign the verdicts for volun-

tary and involuntary manslaughter because those verdicts would be inconsistent with your findings of the offense of murder. Likewise, if you feel from the evidence that there is evidence for voluntary manslaughter or for involuntary manslaughter in your deliberations, you can not find for the other two offenses. Those would be inconsistent theories of law."

The defendant objects to the words, "and should not be considered by you in your deliberations." He contends that "not only did the prosecutor misstate the law to the jurors, she specifically told the jurors to disregard two of the instructions which they were to receive." In determining whether a prosecutor's argument to a jury is prejudicial, reference must be made to the context of the language, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107.) The remark in its entirety shows that, following the words about which the defendant now complains, the prosecutor cautioned the jury about signing the verdicts for murder and involuntary manslaughter if they were to find from the evidence that the defendant was guilty of voluntary manslaughter and about signing the verdicts for murder and voluntary manslaughter if they were to find from the evidence that the defendant was guilty of involuntary manslaughter. Thus, even if the issue had been preserved for appeal, the statement considered in context, as it must be, was not, as the defendant urges, an appeal to the jury to disregard the instructions concerning voluntary and involuntary manslaughter.

■■ ■ With respect to the seventh and final issue raised, the defendant maintains that the sentence of a 30-year term of imprisonment imposed upon the defendant is excessive and constituted an abuse of discretion on the part of the trial court. In pronouncing sentence the court stated that the possible sentence for the offense ranged from 20 to 40 years and that it had considered the defendant's background, the presentence investigation report, the recommendations of counsel, the statutory factors in aggravation and mitigation, and "above all else, *** the facts of this case that were presented to the Court as the Court sat through the trial." The court stated further that, "looking at all the factors in this case, one [*sic*], the Court has come to the conclusion that a minimum sentence in this case would be inconsistent with the ends of justice and would deprecate the seriousness of this offense." The rule is well settled that, in the absence of an abuse of discretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The defendant asserts that the trial court failed

to give sufficient weight to the fact that the defendant had no prior record of criminal conduct. However, the court indicated by its remarks that it had considered this factor but that, in view of the facts of the case, a minimum sentence would disserve the ends of justice and deprecate the seriousness of the offense. The sentence imposed fell in the middle of the limits set forth by the legislature for the offense of murder. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a).) In view of the trial court's express consideration of the factors enumerated and its appropriate concern with respect to the circumstances of the particular case, our review of the record reveals no basis for finding that it abused its discretion in imposing sentence.

Affirmed.

KASSERMAN and HARRISON, JJ., concur.