THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLABON EPPS, Defendant-Appellant.

Fifth District   No. 5—88—0724

Opinion filed April 18, 1990.

James J. Gomric, P.C., of Belleville, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, and Larry Kuster, of counsel), for the People.

JUSTICE HOWERTON delivered the opinion of the court:

"She said, 'Well, Mom, I am going,' and I said, 'Okay, you all be careful,' and she walked on around the car to get in the car. By the time she got in there and slammed the door, out come Clabon with this gun in his hand and I said, 'Connie, get away, Connie, quick as you can. Here come Clabon with a gun. Get going fast as you can!' I said. And she was so nervous she couldn't put that key in and then whenever he did come up there and go up to the car, he had taken his hand and pulled that little boy's head and pumped them bullets into his head. He didn't hold his hand and the little boy, when he shot him, and he said, 'Oh,' and he pumped another bullet and the third time he didn't say nothing and I said, 'Clabon, you don't kill my daughter. Don't kill my daughter.' He aimed his body around like this so he could get Connie and he shot her twice."

So testified the mother of Connie, the little boy's grandmother.

A four-day trial ended when a jury convicted 64-year-old Clabon

Epps of the first degree murder of seven-year-old Robert Mackin, and also of armed violence, attempted murder and aggravated battery on the seven-year-old's mother, Connie Bennett.

Sentenced to concurrent terms of 20 years for murder and 10 years for armed violence, defendant appeals. We affirm, rejecting his four claims of error.

I

Defendant's first claim consists of two parts. The factual basis of his claim is: (a) a bailiff and a juror talked during deliberations; and (b) this same juror, when answering the poll of the jury after verdict, paused, shook, and sobbed before answering, "yes," it was her verdict. Defendant claims that these facts taken together show that the juror did not assent freely to the verdict, and therefore, the verdict was coerced.

To expand the factual basis of defendant's claim, we note that the jury had been told throughout the case that the State was going to ask for death. The jury took the case and began their deliberations. During their deliberations, a juror asked the bailiff, "Is there any way I can get out of this? Do I have to help make a decision?"

The bailiff reported the conversation to the judge, but neither the State's Attorney nor defense counsel was informed. The judge instructed the bailiff to tell the juror that the jury had to make whatever decision they were going to make in the case and that the juror was not going to be relieved of her service.

The bailiff carried out the instructions, telling the juror what the judge had said. The juror said "okay."

Later, after verdict and while the jury was being polled, this same juror, when asked whether this was her verdict, became visibly shaken, began to cry, delayed answering by 30 seconds, then blurted out "yes" and continued to cry.

Defendant moved for a mistrial, arguing that this juror's decision was not voluntary, but coerced.

The circuit court examined the circumstances and said that the crying was the outward manifestation of making a difficult decision, given that the 64-year-old defendant was on trial for shooting a seven-year-old and, if convicted, was facing death. The circuit court then found that the juror had said expressly that the verdict was hers and gave no indication, other than sobbing and delaying her answer, that it was not her verdict. The juror, therefore, was found to have voluntarily assented to the verdict, and the motion for mistrial was denied.

We examine each component of defendant's single argument.

## A

We must examine initially whether the St. Clair County circuit court should have granted a mistrial because a bailiff and a juror talked during deliberations.

■ No prejudice is presumed from a third person's communication with the jury; it must appear from the record that prejudice resulted, or that there was an intent to influence the jury's decision. (*People v. Veal* (1978), 58 Ill. App. 3d 938, 374 N.E.2d 963.) No jury verdict will be set aside because of a communication with a juror by court personnel or other third persons outside the presence of the accused unless it is apparent that prejudice resulted from the exchange. *People v. Cart* (1981), 102 Ill. App. 3d 173, 429 N.E.2d 553.

■ Review of the record shows no prejudice. The record displays no intent to influence the jury's decision. The essence of this communication is that a juror wanted off a case and the judge refused the request.

## B

We next examine the juror's response to the polling of the jury and her conduct and determine whether the circuit court's finding that the verdict was voluntary is unreasonable.

■ A trial judge has discretion to determine whether a juror's assent to a verdict is voluntary, and that determination will not be set aside unless it clearly is unreasonable, because "the trial judge, in determining whether a juror has freely assented to the verdict, not only hears the juror's response, but observes the juror's demeanor and tone of voice during the course of the polling of the jury." *People v. Cabrera* (1987), 116 Ill. 2d 474, 490, 508 N.E.2d 708, 714.

The juror said nothing during polling that demonstrated that the verdict was not hers. She unambiguously stated "yes"—it was her verdict. All she did was show emotion. Emotion shown is not necessarily involuntariness revealed.

This was a hard case.

To put the tragedy in full view, this 64-year-old defendant had just suffered the pain and humiliation of being beaten on his own front lawn by the seven-year-old victim's father, a much younger man—a beating that was so prolonged, so terrible and so brutal, that passersby had halted and begged the younger man to stop the outrage.

As the young man let him up, defendant pulled a carpet knife from his jacket pocket, and threatened the father, and he, the young father, got in his truck and drove off.

Bloodied, defendant went inside his house, tried to wash the blood

from his face, and then pulled a gun and shells from his bureau drawer.

Defendant went back outside, loaded gun in hand, and stepped toward the street. With mother and son in their car preparing to leave, grandmother, seeing defendant and recognizing death, yelled, warning her daughter, while defendant walked on, as the mother, herself then seeing and knowing it was death that stalked them, and so nervous she couldn't put the key in the ignition, tried to fire up the car and drive herself and her son to safety, and defendant continued to come on, and then fired and killed the boy in full view of the boy's mother and grandmother.

The State was asking for the death penalty and did not waive death until after the jury was polled.

■ In this context, the emotion shown by the juror is ambiguous. It is ambiguous because there are at least two inferences. The first inference is that although the tragedy moved the juror, she nevertheless would remain true to her oath and render a verdict of guilty of first degree murder. The second inference is that the juror was yielding to illicit coercion and rendering her verdict contrary to her belief and to her oath.

On the other hand, her verbal response, "yes," is unambiguous.

The unambiguous response, when weighed against the ambiguity, so completely tilts the scales of justice so that we find it difficult to see any result other than the one announced by the circuit court.

Keenly aware that we were not witnesses to the polling, fully acquainted with the record, and giving the deference to the circuit court that the law commands, we affirm the discretionary finding that this verdict was voluntary.

## II

Defendant's second claim consists of four syllogistic steps: (1) the testimonies of the slain boy's mother, grandmother and a neighbor were all so in conflict with the findings of a pathologist, as well as the findings of a forensic scientist, that they should be found to have been perjured; (2) therefore, those testimonies should be discarded; (3) therefore, this case lacks credible evidence as to the actual shooting and killing of the boy; and (4) therefore, the circuit court's refusal to direct a verdict in defendant's favor is erroneous.

The first step for us, of course, is to identify the conflict. The conflict: the mother, who also was the victim of the armed violence, testified defendant stuck the pistol to the boy's head and fired—in contrast, the forensic scientist found the boy to have been shot from a

distance, not point blank; the grandmother testified that defendant shot the boy in the head three times—in contrast, the autopsy showed that the boy had been shot only once; the neighbor testified that three, or four, or maybe five shots had been fired, likewise in conflict with the autopsy.

Our vantage point is one step further removed from the thunder-strike of reality than the vantage point of the jurors. Whereas they did not see or hear or smell or touch or taste the killing, the death, or the tragedy that forevermore will mark the mother's, the grandmother's, the father's and the defendant's lives, the jurors at least saw and heard the witnesses. Not us. We neither saw, nor heard, the shooting. We are called to make our ruling on the reported account of those we neither saw nor heard.

Not only that, but for every incident, no matter how benign, the descriptions of an event vary in accordance with the number of witnesses. The descriptions vary according to each witness' perception, to each's memory, and to each's ability to narrate. As the shock and outrage of an incident escalates, so we expect the variance to become greater. And, as the event becomes more personal to the witnesses, we expect the event to take on added importance, become bigger, and perhaps, if it is quick-flashing tragedy, more malignant. This is our commonsense observation, and it leads us, juror and reviewing court alike, to accept differences between eyewitness accounts.

What defendant asks of us, a reviewing court, is to brand these three witnesses with the hot iron of perjury. To do that, we must be certain of the fact. And, how can we be, when our common observation in the affairs of life affords explanation of the variance? The boy was shot to death in full view of his mother, his grandmother, and a neighbor. Can we then be surprised that they testified to more than science observed? No. Science may prove less, or more, than spirit sees or hears. Who is surprised that it does? No one. Does it make liars of us? Not necessarily. And, only sometimes, does it make us mistaken.

The facts give us no basis to brand "perjurer" on the witnesses' foreheads, no basis to sew scarlet "P's" upon their breasts.

■ Since we have declined defendant's invitation to brand the witnesses "perjurers," the question becomes whether the evidence, viewed most strongly in favor of the State, allows a reasonable mind to conclude guilt beyond a reasonable doubt. *People v. Withers* (1981), 87 Ill. 2d 224, 429 N.E.2d 853; *People v. Henderson* (1981), 95 Ill. App. 3d 291, 419 N.E.2d 1262.

In this case, there was ample physical evidence and oral testimony

upon which a jury could find the defendant guilty beyond a reasonable doubt of first degree murder. Therefore, the circuit court's denial of defendant's motion for directed verdict is affirmed.

## III .

Defendant's third claim is that the circuit court erred in refusing to direct a verdict of not guilty of first degree murder, and argues that the beating defendant suffered was substantial provocation as a matter of law, thereby making it sufficient to acquit defendant of first degree murder.

■■ When a defendant is on trial for first degree murder and evidence of a mitigating factor is introduced, the Criminal Code of 1961 provides "the burden of proof is on the defendant to prove [a] mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c).

■■ In this case, the mitigating factor is provocation. The statute provides:

> "(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:
>
> (1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).

The statute further states that serious provocation is conduct sufficient to excite an intense passion in a reasonable person. Ill. Rev. Stat. 1987, ch. 38, par. 9—2(b).

In this case, only two people qualify as provocateur—one the boy, the individual killed, the other, the father of the boy.

What, then, was the serious provocation by the boy, which inflamed defendant to sudden and intense passion? The boy had broken branches from defendant's tree, hardly serious provocation.

The provocation by the father? He had beaten defendant.

■■■ "(T)he sufficiency of the provocation to cause sudden and intense passion is a matter to be determined by the trier of fact." (*People v. Pruitt* (1987), 154 Ill. App. 3d 22, 32, 506 N.E.2d 696, 702.) The jury, in this case, may have believed that the interval of time that elapsed from the beating to the killing was sufficient, under the circumstances, to have allowed boiling blood to have cooled, passion to

have subsided. Furthermore, even if the jury had not believed that the passion should have quieted, they still could have found defendant guilty of first degree murder. When one in a sudden intense passion endeavors to kill the provocateur, but kills another, the killing is second degree murder only if the killing was negligently or accidentally caused. In this case, the jury may have rejected negligence, rejected accident, and instead found intent. See *People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.

Either way, it was their call, not ours, and we find that the verdict was not so unreasonable so as to require a verdict of not guilty of first degree murder to have been directed.

## IV

■■■ Defendant lastly claims that the Illinois Pattern Jury Instruction 7.01A together with section 9—1 *et seq.* of the Criminal Code (Ill. Rev. Stat. 1987, ch. 38, par. 9—1 *et seq.*) deprive him of equal protection of laws. Defendant contends that the instruction is flawed constitutionally, because although the instruction allows defendant to be found guilty of first degree murder if he intended to kill the father, but killed the boy instead (a doctrine known as "transferred intent"), the statute that defines second degree murder does not allow the jury to acquit him of first degree murder and convict him of second degree murder by transferring to the boy the father's provocation. Fleshed out, the argument is that, although the legal fiction of "transferred intent" makes the boy, legally, the object of defendant's intent to kill the father, the law does not allow defendant to transfer the result of his provocation, *i.e.*, make the boy legally the provocateur, when the father, in fact, was. Defendant offers no argument or authority in support of his contention, and we do not decide the issue, since it has not been fully briefed and argued. However, we believe we would be wary of accepting as good law any doctrine which would mitigate a killing on grounds that, "Joe made me angry, so I killed Bill."

We hold, however, that defendant has not preserved this issue for appeal, as it is not in his post-trial motion. Accordingly, it is waived. *People v. Volkmar* (1989), 183 Ill. App. 3d 149, 538 N.E.2d 1255.

Affirmed.

CHAPMAN and RARICK, JJ., concur.