THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT KEGLEY, Defendant-Appellant.

Second District   No. 2—90—0263

Opinion filed March 30, 1992.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

After a jury trial, defendant, Robert Kegley, was found guilty of home invasion and attempted kidnapping, and the lesser included offenses of criminal trespass to residence, battery and unlawful restraint. Defendant admitted the events that led to his convictions, but asserted defenses of intoxication and insanity induced by such intoxication. After finding defendant's prior conviction of rape and the victim's physical impairment to be factors in aggravation warranting an extended sentence (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—2, 1005—5—3.2), the court sentenced defendant to 60 years' imprisonment on his conviction of home invasion and 10 years' imprisonment on his conviction of attempted kidnapping, with the sentences to run concurrently. Defendant appeals, asserting that the trial court abused its discretion in: (1) excluding certain evidence, which prevented defendant from effectively cross-examining and challenging the credibility of a key State witness; (2) refusing pattern jury instructions as confusing; (3) charging the jury to "keep deliberating" and in sequestering the jury at 1:30 a.m. after almost five hours of deliberations, thereby coercing a guilty verdict or allowing the opportunity for jury misconduct; and (4) imposing an extended sentence. We affirm.

Initially we note that this is defendant's second appeal. (*People v. Kegley* (1988), 175 Ill. App. 3d 335.) However, the facts were not necessary to our prior determination of defendant's first appeal. Therefore, to resolve the issues raised on this appeal, we must fully set out the facts leading to defendant's indictment and his second trial.

In the early morning hours of March 25, 1986, Sandra Dyer (victim) was awakened by noises at the back door of her second-floor apartment, which she occupied alone. Although she had locked and deadbolted both the front and back doors to her apartment, when she heard footsteps she used the phone next to her bed to call the police. She was still on the phone with the police when she saw defendant, whom she had never seen before, at her bedroom door and screamed. Defendant entered her bedroom and, after hitting her with what apparently was a beer bottle, grabbed her around the neck in a choke hold and said "[y]ou told them, didn't you[?]" The police dispatcher's recording of the victim's call reflected this statement, and one of the victim's neighbors, Mia Torrez, overheard that comment through the thin adjoining bedroom wall.

Defendant pulled the victim around the apartment while repeatedly asking for her car keys and telling her that they had to get out of there. Despite this close proximity, the victim failed to detect any odor of alcohol on defendant's breath. Although the victim told defendant that she had a broken back, he responded "[l]ike hell you do." Eventually, after striking the victim's head against the wall and punching her in the face, defendant fled with the victim's car keys as the police arrived. The victim hid in her locked bathroom until the police entered her apartment.

Police officers responding to the victim's call saw defendant leave the victim's apartment by the front door, taking the steps two or three at a time and falling to all fours at the foot of the apartment stairs. With his gun drawn, an officer approached defendant and told him to stop, to which defendant responded by telling the officer to shoot, rolling to his feet, and running away. Defendant fell two more times, each time telling the officer to shoot when the officer approached and told defendant to stop. Eventually, the officers tackled defendant and subdued him.

One of the officers noticed the smell of alcohol on defendant's breath, but defendant walked on his own without stumbling or staggering. A second officer did not notice any smell of alcohol, but did note that defendant walked without problem. Neither of the officers believed defendant was intoxicated. A third officer also failed to notice any indication of alcohol on defendant's breath. However, a

fourth officer, who was involved with defendant's handling at the police station after his arrest, noticed a slight smell of alcohol, although defendant neither slurred his speech nor mumbled. A blood sample taken from defendant six hours after the break-in tested with an alcohol level of .124.

Defendant's brother refused to allow defendant to visit his home two days before the break-in on March 23, 1986, because defendant was drunk and not in any shape to be around his nieces and nephews. At home with his father on March 24, 1986, defendant could not sit still, paced and was not himself. A friend, with whom defendant frequently drank, shared a 12-pack of beer with defendant on the 24th. However, defendant's friend passed out before defendant left. Finally, a bar owner and his wife both testified that defendant had been in their bar drinking on March 24 but that he was not intoxicated.

After his apprehension, defendant told the officers that they had the wrong man and that he had been trying to help the victim. He also indicated that he knew James Sibiski, who was the victim's neighbor and known by the nickname of "Wiener," and that Sibiski would be upset when he learned of defendant's arrest and the events leading to it. Both Sibiski and his roommate, Mia Torrez, overheard some of these comments. For two years, Sibiski was defendant's foreman at a concrete company and routinely drove defendant to work.

After his arrest, electrical tape matching that found on a railing leading to the victim's back door was recovered from defendant in addition to a syringe, a bag containing powder containing cocaine, a pipe containing residue of cannabis, and a vial of liquid. Defendant threw himself against the bars and walls of his cell, yelling, spitting and cursing at officers at the police station.

In mid-July 1985, nine months before the incident giving rise to the charges against defendant, the victim and a girlfriend had been abducted at knife point in their car from the parking lot of a bar. Neither girl saw their abductor, who forced them to keep their heads down during a high-speed car chase with the police, which ended in a car crash. The abductor escaped and was never apprehended, although a palm print was lifted from the window of the girls' car. As a result of the crash, the victim suffered a fractured vertebra in her spine, which required surgery. The abduction was a matter of some notoriety in the local papers.

On March 26, 1986, Sibiski met with police without mentioning any involvement of defendant in the 1985 abduction. However, on April 2 Sibiski told police that several days after the 1985 abduction defendant had admitted abducting the victim and her girlfriend, who

was Sibiski's ex-wife. Although Sibiski told Mia Torrez of defendant's involvement in the abduction, neither Sibiski nor Torrez, who was a friend of the victim, ever told the victim or police that defendant was the abductor.

Sibiski also told police that defendant had not been at work the two days following the abduction and that on one occasion after the abduction defendant had accompanied Sibiski to his apartment on a lunch break. When the victim came into view, defendant hid his face and ducked down into the car. Originally, Sibiski told police that the lunch-break incident happened in the summer of 1985, but during these proceedings he testified that it occurred in the spring of 1986 shortly before the break-in because he recalled the trees being in bud. Sibiski's testimony was the only evidence linking defendant to the 1985 abduction because defendant's palm print did not match that taken from the car in which the victim had been abducted.

The defense did not deny defendant's part in the 1986 break-in, but asserted voluntary intoxication and insanity based on such intoxication as defenses negating the required intent element of the charges of home invasion and attempted kidnapping. Before trial in his motion *in limine* and again before his cross-examination and before direct examination of Sibiski, defendant's counsel sought a ruling that evidence of Sibiski's involvement with drugs was admissible to impeach his testimony. Defendant's counsel sought to introduce such impeachment evidence through the testimony of a man named Eisen, who would testify that Sibiski had used and sold drugs, and the similar testimony of defendant's deceased brother, Charles, at defendant's prior trial.

Specifically, defendant's counsel argued that Sibiski's sales of drugs, about which defendant knew, motivated Sibiski to fabricate defendant's involvement in the victim's 1985 abduction to further implicate defendant and prevent defendant from negotiating a plea bargain with the State in exchange for testimony against Sibiski on drug charges. During lengthy colloquies on three occasions, defendant's counsel repeated this argument with only brief reference to evidence of "the extent of Mr. Sibiski's drug use." The court reserved ruling on defendant's motion *in limine* until trial and then ruled that any such impeachment was beyond the scope of the State's direct examination of Sibiski, and its admissibility would be considered during defendant's case in chief.

On the next day, when defendant began his case, however, Eisen was unavailable to testify. Defendant offered the transcript of the prior testimony of Charles Kegley, Jr., defendant's brother, that

Charles had been introduced to Sibiski by defendant, at which time Charles arranged the first of many drug purchases from Sibiski. Also included in that testimony was a recitation of one incident where Charles had been at Sibiski's apartment to purchase drugs and had seen cocaine apparently being used by Sibiski and others at Sibiski's apartment. The court ruled that evidence of Sibiski's offer to sell drugs to Charles that occurred in defendant's presence was admissible. However, the court ruled that evidence of sales unrelated to defendant was inadmissible.

Various psychologists and psychiatrists then testified as experts both for defendant and for the State in rebuttal. Their testimony concerned the effect of defendant's chronic alcohol and drug abuse and his intoxication on his ability to form the requisite intent on the night of the break-in.

During the instructions conference, defendant's counsel tendered Illinois Pattern Jury Instructions, Criminal, Nos. 2.01R and 26.01R (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d (Supp. 1989)). However, defendant's counsel agreed such instructions were confusing and should not be given. The court, therefore, instead instructed the jury on each count of the indictment using the former version of those instructions. Illinois Pattern Jury Instructions, Criminal, Nos. 2.01, 26.01 (2d ed. 1981) (hereinafter former IPI Criminal 2d).

Shortly before 9 p.m., the jury began deliberations. After 1½ hours they sent a note to the court asking if they were permitted to reach a verdict on three of the five counts and to be hung on the remaining two counts. The court, over defendant's objection, responded "[k]eep deliberating."

After an additional two hours of deliberations, the court inquired of the jury if they were close in reaching verdicts on all five counts. The jury responded "no (but 4/5)."

At 1:20 a.m. the jury sent a second inquiry to the court asking for further instructions on the specific intent necessary for the offense of home invasion. The court responded that the jury had received the instructions on the law. The court denied defendant's motion for a mistrial or for a declaration of a hung jury based on the lateness of the hour.

Just after 1:30 a.m., after almost five hours of deliberation, the court told the jury to stop deliberating and order them sequestered for the night at a nearby hotel, two jurors to a room. The court admonished the jurors not to discuss the case. The next morning, the jury resumed deliberations and returned guilty verdicts on all five counts after 15 minutes of deliberations.

After considering evidence in mitigation and aggravation, the court found two factors in aggravation. In addition to defendant's prior conviction of rape, the court found that the victim's crushed vertebrae or broken back was a physical disability, justifying an extended sentence. The court sentenced defendant to 60 years' imprisonment on his conviction of home invasion and a concurrent sentence of 10 years' imprisonment for attempted kidnapping.

Defendant first asserts that the trial court abused its discretion in ruling that evidence of Sibiski's sales of drugs made outside the presence of defendant and of a single instance of implicit drug use by Sibiski were inadmissible for purposes of impeachment. We note that no error can be based on the failure to allow the defendant to cross-examine Sibiski about his contact with Eisen, because Eisen was unavailable to testify to perfect such impeachment. (*People v. Olinger* (1986), 112 Ill. 2d 324, 341; *Hackett v. Equipment Specialists, Inc.* (1990), 201 Ill. App. 3d 186, 197.) Thus the only evidence that defendant argues was improperly excluded was a portion of the testimony of defendant's brother, Charles.

The trial court has wide latitude in determining the permissible scope of cross-examination. (*People v. Collins* (1985), 106 Ill. 2d 237, 269; *People v. Doll* (1984), 126 Ill. App. 3d 495, 507.) Any matter of permissible impeachment may be developed on cross-examination to test the credibility of the witness. (*Collins*, 106 Ill. 2d at 269.) Impeachment on a collateral matter is, however, not permissible, and the determination that a matter is collateral is similarly committed to the discretion of the trial court. (*Collins*, 106 Ill. 2d at 269.) A reviewing court will not reverse such exercise of discretion unless there has been a clear abuse, which results in manifest prejudice to the defendant. *Collins*, 106 Ill. 2d at 269.

The right to cross-examine a witness about an unlawful or disreputable occupation or activity as a matter affecting the witness' credibility is unchallenged. (*People v. Strother* (1972), 53 Ill. 2d 95, 99; *People v. Crump* (1955), 5 Ill. 2d 251, 260.) Such evidence prevents a witness from falsely presenting a respectable, and therefore credible, image to the jury. (*People v. Bond* (1917), 281 Ill. 490, 499; *People v. White* (1911), 251 Ill. 67, 74.) Drug addiction is one such activity that is admissible for purposes of impeachment. (*Collins*, 106 Ill. 2d at 269; *Crump*, 5 Ill. 2d at 260.) Evidence of drug addiction is admissible not only to impeach a witness' ability to perceive and recall or testify, but to impeach such witness' honesty and integrity generally. *People v. Galloway* (1974), 59 Ill. 2d 158, 163; *People v. Bazemore* (1962), 25 Ill. 2d 74, 77.

Defendant's counsel repeatedly asserted that evidence that Sibiski sold drugs was admissible to impeach Sibiski's motive for testifying that defendant committed the 1985 abduction. Defendant's counsel argued that Sibiski's motive was to implicate defendant and solidify the State's case. The State would thereby be discouraged or prevented from considering any cooperation and testimony of defendant against Sibiski on drug charges in exchange for more favorable treatment of defendant. Therefore, the court found that absent defendant's knowledge of Sibiski's sales of drugs, Sibiski had no motive to fabricate defendant's part in the 1985 abduction. Defendant's counsel also argued the admissibility of evidence of drug addiction to attack Sibiski's honesty generally, although such argument appears to have been almost an afterthought.

■ Defendant's offer of proof of Sibiski's drug addiction consisted of evidence of a single instance of drug use implicit from the obvious presence of drugs in Sibiski's apartment during Charles' purchase of drugs from Sibiski. We decline to hold that the court abused its discretion in finding that such evidence alone did not rise to the level of drug addiction. (See *People v. Siebert* (1979), 72 Ill. App. 3d 895, 903; *People v. Nelson* (1975), 31 Ill. App. 3d 934, 938 (possession of drugs is not synonymous with addiction).) However, we see no reason to distinguish between a witness who uses drugs and one who sells drugs when a defendant offers such evidence to attack the truthfulness of such witness' testimony. Although use of drugs is necessary if impeachment is based on the lack of ability to "observe, accurately reflect and retain what was observed" (see *Galloway*, 59 Ill. 2d at 163), such use is not necessary to attack a witness' credibility generally. Therefore, we find that evidence of Sibiski's alleged sale of drugs was admissible for the limited purpose of impeaching Sibiski's integrity and honesty generally.

However, a finding that evidence of drugs sales is admissible to attack a witness' honesty and integrity does not necessarily render the trial court's refusal to admit such evidence in this instance an abuse of discretion requiring reversal. If ample impeachment evidence is allowed, limitations placed on a defendant's cross-examination are harmless beyond a reasonable doubt. (*People v. Owens* (1984), 102 Ill. 2d 88, 103-04; *People v. Shinkle* (1987), 160 Ill. App. 3d 1043, 1055-56; *People v. Hines* (1981), 94 Ill. App. 3d 1041, 1047-48.) The trial court's failure to admit evidence of Sibiski's alleged sales of drugs resulted in part from defendant's counsel's almost exclusive argument that such evidence was proof of Sibiski's motive to fabricate defendant's involvement in the 1985 abduction. The court correctly deter-

mined that such motive would have required that defendant be aware of Sibiski's sales of drugs. However, the court nevertheless allowed defendant to introduce evidence of Sibiski's involvement in the sale of drugs that were witnessed by defendant.

The testimony of defendant's brother, Charles, at the prior proceeding was admitted. Charles had testified that, in the defendant's presence, Sibiski offered to sell cocaine to Charles the first time they met. Thus, the jury heard evidence of Sibiski's involvement in the sale of drugs that tended to impeach his general credibility, although such evidence was itself subject to credibility infirmities. Implicit in Charles' inquiry to buy drugs was his own addiction, which, in addition to his arguable bias as defendant's brother, diminished the value of Charles' testimony to attack Sibiski's credibility.

Defendant also attacked Sibiski's credibility through evidence that Sibiski and his girlfriend, who was the victim's friend, failed to reveal defendant's identity as the abductor despite defendant's revelation that he was involved almost immediately after the 1985 incident. In addition, defendant presented evidence that Sibiski delayed in revealing such information to the police even after defendant had again directed violent behavior towards the victim. Thus, we find that the jury had ample evidence of impeachment on which to base its determination of Sibiski's credibility, and any error from the court's refusal to allow defendant to further inquire into Sibiski's drug involvement was harmless beyond a reasonable doubt. See *Owens*, 102 Ill. 2d at 103-04.

Defendant next contends that the trial court erred in not giving revised IPI Criminal 2d Nos. 2.01R and 26.01R (Supp. 1989) and instead giving the former versions of those instructions. However, a party may not raise the failure of the trial court to give an instruction that was withdrawn (see *People v. Underwood* (1978), 72 Ill. 2d 124, 129-30), and the use of an earlier version of a pattern instruction that still correctly states the law is not reversible error. *People v. Tucker* (1990), 193 Ill. App. 3d 849, 854.

■ Defendant's counsel not only agreed that the revised versions of his tendered jury instructions were confusing, which would have justified the court's refusal to give such instructions (*Tucker*, 193 Ill. App. 3d at 854), but also agreed that the former version of each instruction should be given. Thus, in effect defendant's counsel withdrew his tendered revised IPI Criminal instructions. Therefore, the court did not err in giving former IPI Criminal 2d Nos. 2.01 and 26.01, which still correctly stated the applicable law. See *Tucker*, 193 Ill. App. 3d at 854.

Defendant next contends that certain conduct of the circuit court improperly influenced the jury's verdict. Defendant contends that the court coerced the guilty verdicts when it charged the jury to "[k]eep deliberating" after the jury inquired whether they could be hung on two of the five counts. Defendant also asserts that the trial court abused its discretion in sequestering the jury at 1:30 a.m. after five hours of deliberations and that the brevity of the jury's deliberations upon reconvening indicates jury misconduct.

An instruction to a deadlocked jury is improper if it hastens a verdict, coerces a juror to make a determination in conflict with that juror's views, or otherwise interferes in deliberations such that a defendant is prejudiced. (*People v. Jenkins* (1989), 190 Ill. App. 3d 115; *People v. Palmer* (1984), 125 Ill. App. 3d 703.) The mere opportunity for improper influence absent a showing that such improper influence occurred is insufficient to warrant a new trial. (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 1034.) However, a jury is required to return a verdict on each offense charged (Ill. Rev. Stat. 1989, ch. 38, par. 115—4(j)), and a circuit court has a duty to provide guidance to a jury that is not hopelessly deadlocked. (*People v. Prim* (1962), 53 Ill. 2d 62, 76.) To do so, the trial court may insist that jurors deliberate further if a jury deliberates only a short time before declaring unanimity unreachable. *Lowenfield v. Phelps* (1988), 484 U.S. 231, 238, 98 L. Ed. 2d 568, 578, 108 S. Ct. 546, 551.

■ In this instance, the court's charge to "[k]eep deliberating" did not hasten the verdict because deliberations continued more than twice the amount of time as had elapsed prior to the jury's inquiry. Upon polling of the jury after the verdict, no juror expressed any dissatisfaction with the verdict. Thus, on the record in this case, no improper influence is apparent.

Both *Jenkins v. United States* (1965), 380 U.S. 445, 13 L. Ed. 2d 957, 85 S. Ct. 1059, and *People v. Katalinich* (1987), 153 Ill. App. 3d 778, on which defendant relies, are distinguishable. In *Jenkins*, the improper charge was "[y]ou have got to reach a decision in this case." (*Jenkins*, 380 U.S. at 446, 13 L. Ed. 2d at 958, 85 S. Ct. at 1060.) The imperative contained in that charge is totally absent from the circuit court's direction to "[k]eep deliberating."

In *Katalinich*, the jury returned both guilty and not guilty verdicts on several counts, but made no findings as to two counts of the indictment. The trial court instructed that jury they "must return back to the jury room and return two more verdicts." (*Katalinich*, 153 Ill. App. 3d at 783.) This instance is distinguishable both because here the court instructed the jury before they returned any verdicts

and because the imperative tone of *Katalinich*'s instruction is absent. Thus, neither *Jenkins* nor *Katalinich* is controlling.

Although defendant concedes that the decision to sequester a jury is peculiarly within the discretion of the circuit court (*People v. Flint* (1986), 141 Ill. App. 3d 724, 736), defendant asserts that *Flint*, in which we affirmed the trial court's decision to allow elongated deliberations and *People v. Whitecotton* (1987), 162 Ill. App. 3d 173, in which the trial court allowed 17 hours of deliberations, require a trial court to allow a jury to deliberate more than the five hours that occurred here. However, neither *Flint* nor *Whitecotton* mandates lengthy deliberations, and we reject a mathematical evaluation of the appropriate length of jury deliberations before a court may properly decide to sequester a jury.

In *Flint*, the jury were allowed to deliberate less than an additional two hours until 2:15 a.m. after the giving of a deadlock instruction. (*Flint*, 141 Ill. App. 3d at 735-36.) Although the court in *Whitecotton* allowed the jury to deliberate for 17 hours, such deliberations continued only four hours after the court's deadlock instruction. (*Whitecotton*, 162 Ill. App. 3d at 186.) In addition, the *Whitecotton* court's decision to allow such lengthy deliberations was based on the jury foreman's explicit indication that the jury could reach a verdict in a few hours and that it was in the best interests of the jury to continue deliberations. *Whitecotton*, 162 Ill. App. 3d at 186.

In this instance the court sequestered the jury at 1:20 a.m., four hours after its charge to "[k]eep deliberating" and in the absence of any expression by the jury that a verdict was close or that they desired to keep deliberating. In light of the lateness of the hour, the length of deliberations after the court's deadlock instruction, and the lack of indication of any desire on the part of the jury that they wished to continue deliberations, the trial court's decision to sequester the jury was not an abuse of discretion.

Nor do we find any merit in defendant's assertion that the brevity of deliberations upon reconvening the next day is evidence of jury misconduct during the sequester, which is totally unsupported by factual allegations. Rather, we must presume that a jury followed the court's instructions to refrain from discussion of the case. *People v. Barrow* (1989), 133 Ill. 2d 226, 266.

Finally, defendant asserts that the court improperly considered as a factor in aggravation the victim's crushed vertebrae. However, the court also expressly found that defendant's prior conviction of rape was a factor in aggravation warranting an extended sentence.

Sentencing is a matter for the discretion of the trial court, whose decision will not be reversed absent a showing of abuse of such discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) Although the presence of a single statutory factor in aggravation is sufficient to support the imposition of an extended sentence, the court may also consider nonstatutory factors when imposing an extended sentence. *People v. Diaz* (1989), 189 Ill. App. 3d 473, 477-78; *People v. Thomas* (1988), 168 Ill. App. 3d 113, 118.

■ Thus, the court's consideration of defendant's prior conviction was sufficient to impose an extended sentence, and we do not address whether the victim's physical limitations as a result of the crushed vertebrae in her back were a physical handicap for purposes of aggravation as provided in the statute. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(4)(iii).) However, we note that the court was free to consider such condition in fashioning an appropriate sentence having correctly found that defendant was eligible for an extended sentence based on his prior conviction alone.

For the foregoing reasons, we affirm defendant's convictions and sentences.

Affirmed.

INGLIS, P.J., and McLAREN, J., concur.