# Illinois Official Reports

## Appellate Court

---

### *People v. Castillo*, 2019 IL App (2d) 160873

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEXANDER G. CASTILLO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0873 |
| Filed | January 24, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 10-CF-2035; the Hon. Joseph G. McGraw, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Sally A. Swiss, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Presiding Justice Birkett and Justice Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Alexander G. Castillo, appeals from the summary dismissal of his *pro se* petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) for relief from his convictions of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and a single count of home invasion (*id.* § 12-11(a)(5)). Defendant contends that his petition sufficiently stated a claim that he was deprived of his right to the effective assistance of counsel in his direct appeal. The claim was based on appellate counsel's failure to argue that the trial court erred by restricting the cross-examination of a witness who testified that defendant admitted committing the murders. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    After a jury trial, defendant was found guilty of two counts each of first degree murder and home invasion. He was sentenced to concurrent natural-life prison terms for the first degree murder convictions and concurrent 51-year prison terms for the home invasion convictions. The trial court ordered the sentences for the home invasion convictions to be served consecutively to the sentences for first degree murder. We vacated one of the convictions of home invasion, but affirmed defendant's other convictions. *People v. Castillo*, 2015 IL App (2d) 130515-U (*Castillo I*).

¶ 4    For the sake of efficiency, we will borrow, with appropriate modifications, *Castillo I*'s summary of the evidence at trial. In the early morning hours of May 10, 2010, Christa Clark and her husband, Michael Clark, were shot to death in their Rockford home. Christa's seven-year-old son, A.B., and her infant daughter were in the house at the time of the shooting. After the shooting, A.B. went to the home of a neighbor, David Saunders. Saunders testified that his daughter woke him at about 2 a.m. and told him that someone was knocking on the door. When Saunders answered the door, A.B. told him that a friend of Christa's had shot and killed Christa and Michael. Saunders contacted the police. Saunders's daughter testified that, when she heard the knocking, she looked at her clock, which indicated that it was 2:13 a.m. A police officer arrived at the scene at 2:24 a.m.

¶ 5    One of the victims' neighbors, Andrew Fry, testified that he heard a "spurt" of gunshots at around 2 a.m. on May 10, 2010. Fry then heard an engine noise that sounded like it could have come from a muscle car or a loud muffler. Another neighbor, Steve Peterson, testified that shortly after 2 a.m. on May 10, 2010, he heard a loud noise while watching television. Peterson described the noise as a "metal bang" that sounded like metal trash cans being knocked over. Peterson went outside to see what was happening. He did not see anything, so he went back inside. Then he heard two more loud metal banging noises. He went to the front door and saw an individual running toward a car that had its engine running. The individual got into the car and drove away quickly. Peterson did not know what type of car the individual was driving, but it looked like an Oldsmobile 88 or Cutlass from the 1980s.

¶ 6    Rockford police officer Melissa Sundly testified that she spoke to A.B. both at Saunders's house and at SwedishAmerican Hospital. A.B. told Sundly that he saw the man who shot Christa. He was a friend of Christa's and Michael's, and A.B. knew him as "Blizz." A.B. told Sundly that Blizz looked through Christa's pockets for money after shooting her. A.B. described Blizz as a white male who was 18 years old or possibly in his twenties. Blizz lived in Wisconsin and drove a red car or a black truck.

¶ 7    Kevin Nordberg, a detective with the Rockford Police Department, testified that he spoke to A.B. at the hospital. A.B. stated that he had been awakened by gunshots. A.B. saw Blizz—whom he had seen on two prior occasions—point a gun at Christa and then pull the trigger. A.B. saw Blizz going through Christa's pockets and saw money lying near Christa. After Blizz left the house, A.B. saw that Michael had also been shot. A.B. told Nordberg that he picked up a cell phone that he found and unsuccessfully tried to call his "dad," Jack Buttita. A.B. did not recognize the cell phone; he told Nordberg that it must have belonged to Blizz. A.B. told Nordberg that Blizz lived in Janesville, Wisconsin, and drove a red car or a black truck. At about 9 a.m., Nordberg and Detective John Eissens showed a photo lineup to A.B. A.B. pointed to a photograph of defendant and said, " 'That's Blizz.' " Nordberg testified that the police learned that Blizz was the nickname of an individual named Jeremy Haynes, who lived in Rockford. When shown a photograph of Haynes, A.B. said that Haynes was Blizz. A.B. said that Haynes was not the person he had seen at his house. Nordberg testified that A.B. had thought that defendant went by the name Blizz.

¶ 8    Buttita testified that he was not A.B.'s father but had previously dated Christa and had stayed in contact with her and with A.B. Buttita received four phone calls at around 2 a.m. on May 10, 2010. The calls were from a number with the Wisconsin area code 608. Buttita did not recognize the number, so he did not answer the calls. Shortly thereafter, Saunders called Buttita. Although Buttita did not recognize Saunders's number, he answered the call. Saunders told Buttita that Christa and Michael had been killed and that A.B. and his sister had been taken to the hospital. At some point that morning, Buttita informed a detective with the Rockford Police Department about the four calls he had received from the number with the 608 area code. Buttita told the detective that he dialed the number and that his call was transferred to voicemail for someone named "Alex." Buttita recalled that Christa had mentioned in passing that she had a friend named "Alex." The State presented evidence that the number was assigned to a telephone registered to defendant.

¶ 9    Eissens testified that he received custody of a cell phone from another detective. Eissens showed the cell phone to A.B., who indicated that it was Michael's. Eissens testified that there were three text messages sent from Michael's phone to defendant's phone on May 9, 2010. The first message stated, " 'I'm on my way to your house.' " The second message stated, " 'We don't have any money to get home.' " The third message stated, " 'You don't call my wife right now. I am going to punch you in the face, promise.' "

¶ 10    Defendant was arrested in Janesville on the afternoon of May 10, 2010, after leaving the home of Josie Cook, the mother of his daughter. Defendant left Cook's home in a Pontiac Sunfire. A search of that vehicle resulted in the discovery of the cell phone that A.B. had used to call Buttita. A blue Oldsmobile with a piece of cardboard covering the rear license plate was parked in Cook's driveway.

¶ 11    Two detectives with the Rockford Police Department interviewed defendant during the afternoon of his arrest. Defendant stated that he had owed Christa $3450 and had gone to the victims' house at about 12:30 a.m. to repay her. He drove to their house in the blue Oldsmobile. Defendant indicated that Christa had been texting him all day and had been making various threats. Christa informed defendant that someone called "Spanky" had been giving her a hard time. Defendant told the detectives that he did not go to the victims' house right away because he was afraid that Spanky would be there. When defendant arrived, he waited outside. Michael

found defendant and told him that there was nothing to worry about. Defendant left the victims' home a little after 1 a.m.

¶ 12 Defendant initially denied that someone else could have used his phone. After the detectives informed defendant that A.B. had used defendant's phone to call Buttita, defendant said that he did not know how A.B. was able to make the call. Later, defendant related that he had left his phone at the victims' house. Defendant indicated that he returned to the house about 15 minutes later to retrieve his phone. When he arrived, he observed that Christa and Michael had been shot. Defendant denied that he was responsible for the shooting, but he admitted that he told no one that Christa and Michael had been shot.

¶ 13 A.B. testified that defendant was at Michael and Christa's wedding. A.B. also saw defendant on May 9, 2010, when A.B. and his sister traveled with Michael and Christa to defendant's apartment complex in Janesville. A.B.'s account of the events of the early morning hours of May 10, 2010, was essentially consistent with the account he provided to police. A.B. testified that, when he spoke with the police, he thought that defendant's nickname was Blizz. A.B. identified defendant in open court as the individual who had shot Christa.

¶ 14 David Reimann testified that he was serving a seven-year prison sentence for burglary. In December 2015, while the burglary charge was pending, he shared a cell in the Winnebago County jail with defendant. At one point, after defendant visited with his attorney, defendant spoke to Reimann about the circumstances of the crimes. Defendant told Reimann that he had feelings for Christa and that there was a "confrontation" via text messages. Defendant stated that he had gone to the victims' house at approximately 12:15 or 12:30 a.m. on the day of the killings but did not get inside. Defendant returned to the victims' home at about 2:15 or 2:30 a.m. He then entered the dwelling and shot Michael and Christa. Reimann testified that he had not been promised any consideration in exchange for his testimony. He acknowledged that, shortly before his testimony, he had told the prosecutor that he had memory problems partly due to seizures and that he did not recall what defendant had told him. Reimann testified that his seizures did not affect his memory.

¶ 15 During cross-examination of Reimann, the trial court barred defendant's attorney from inquiring about the sentencing range for burglary. Defendant's attorney sought to show that Reimann faced a prison term of 4 to 15 years.[1] He argued that the seven-year sentence that Reimann received was lenient and that it "[went] to the bias, interest, and motive."

¶ 16 The trial court imposed sentence on May 14, 2013. In his direct appeal, defendant argued that he did not receive the effective assistance of counsel at trial. He contended that trial counsel should have moved to suppress A.B.'s identification. Defendant also argued that the State failed to prove home invasion beyond a reasonable doubt and that the evidence did not support multiple convictions of home invasion.

¶ 17 Defendant filed his *pro se* postconviction petition on July 5, 2016, claiming *inter alia* that counsel on direct appeal should have argued that the trial court erred by barring cross-examination of Reimann about the sentencing range for the burglary charge that he was facing when he spoke with police about his conversation with defendant. The trial court summarily dismissed the petition on July 22, 2016. This appeal followed.

---

[1]In this appeal, defendant contends that, based on Reimann's criminal history, Reimann actually could have been sentenced as a Class X offender to a prison term of up to 30 years.

## II. ANALYSIS

¶ 19    We begin our analysis with a brief summary of the general principles governing proceedings under the Act. In *People v. Meeks*, 2016 IL App (2d) 140509, ¶ 3, we observed as follows:

> "Under the Act, a person imprisoned for a crime may mount a collateral attack on his conviction and sentence based on violations of his constitutional rights. [Citation.] Within 90 days after a petition for relief under the Act is filed and docketed, the trial court must examine the petition and either summarily dismiss it or docket it for further proceedings. [Citation.] If the trial court finds that the petition is 'frivolous or is patently without merit,' the petition will be summarily dismissed. [Citation.] Summary dismissal is proper if the petition 'is based on an indisputably meritless legal theory or a fanciful factual allegation.' [Citation.]"

We review *de novo* a summary dismissal. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

¶ 20    In his petition, defendant claimed, *inter alia*, that he did not receive the effective assistance of counsel on appeal. As a matter of due process, a criminal defendant is entitled to the effective assistance of counsel on his or her first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). Claims of ineffective assistance of counsel on appeal are evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), which requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

¶ 21    When the State presents a witness who had criminal charges pending when he or she agreed to testify, the defendant is entitled to cross-examine the witness about his or her motivation to testify.[2] *People v. Dopson*, 2011 IL App (4th) 100014, ¶ 29. The defendant need not show that the witness received any consideration in exchange for testifying. *Id.* "[T]he defense is entitled to inquire into *** promises or expectations [of leniency] whether they are based on fact or are simply imaginary." *People v. Ramey*, 152 Ill. 2d 41, 68 (1992) (citing *People v. Triplett*, 108 Ill. 2d 463, 475-76 (1985)). When gauging a witness's credibility, the trier of fact may consider the witness's "fear of potential punishment and the hope of potential benefit that the witness believes he or she stands to gain from testifying for the State." *Dopson*, 2011 IL App (4th) 100014, ¶ 30. Thus, the defendant may explore the possibility that the witness's testimony was designed "to garner favor with the same body responsible for prosecuting [the witness in his or her] pending cases." *Id.* ¶ 31.

¶ 22    Defendant argues that, for the jurors to fully appreciate Reimann's incentive to testify against defendant, they should have been made aware of the maximum penalty Reimann faced if convicted of the charge against him. In theory, the penalty Reimann faced had some bearing on his credibility. The more severe the penalty Reimann faced, the more likely that hope for leniency would overcome any reluctance to lie to police or to provide false testimony against defendant. However, when the jury is generally aware that a prosecution witness faces a severe penalty for criminal activity, the probative value of the specific sentencing range is marginal. See, *e.g.*, *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997).

---

[2]For purposes of our analysis, we will assume that, when Reimann informed police that defendant had admitted killing Michael and Christa, it was understood that Reimann would testify about what he heard.

¶ 23    Here, the significance of the sentencing range that Reimann faced pales in comparison to the significance of the underlying fact, which was known to the jurors, that Reimann was facing a serious criminal charge when he spoke with police. Furthermore, the jurors were aware that, not long before testifying, Reimann claimed to have no memory of his conversation with defendant. Thus, regardless of what sentence he was facing when he spoke with police, Reimann's credibility was already severely compromised. It is entirely possible that the jurors discounted Reimann's testimony, based on the impeachment evidence they heard, but found defendant guilty based on the other evidence. On the other hand, if the jurors credited Reimann's testimony despite what they already knew about his credibility, it seems highly unlikely that evidence about the sentencing range Reimann faced when he spoke with police would have made any difference. In either case, the guiding principle is that "[i]f ample impeachment evidence is allowed, limitations placed on a defendant's cross-examination are harmless beyond a reasonable doubt." *People v. Kegley*, 227 Ill. App. 3d 48, 55 (1992).

¶ 24    In any event, discrediting Reimann's testimony was not the only hurdle (nor was it the highest one) that defendant had to clear to overcome the State's evidence against him. A.B. identified defendant from a photo lineup and in open court as the person who shot Christa. A.B. recognized defendant as someone he had seen at Michael and Christa's wedding, and he had been to defendant's apartment complex in Janesville. In *Castillo I*, we held that the photo-lineup identification procedure was not suggestive. *Castillo I*, 2015 IL App (2d) 130515-U, ¶ 16. Before the photo lineup was shown to him, A.B. stated that the person who shot Christa was named Blizz. Although defendant was not Blizz, it is apparent that A.B. recognized defendant as the person who shot Christa, but that he was confused about defendant's name. Moreover, defendant's cell phone was at the victims' home after they were killed. When he spoke with police, defendant was evasive about how A.B. had been able to use his phone. Defendant first said that he did not know. He then said that he had left the phone at the victims' home. Defendant also told police that he was unfazed by the sight of the victims' bodies, but it strains credulity that defendant was innocent and yet did not report the victims' deaths to anyone.

¶ 25    In addition, one of the victims' neighbors heard gunfire and then heard a loud automobile engine. Another neighbor saw an individual run to, and drive off in, a vehicle that looked like an Oldsmobile. An Oldsmobile with cardboard covering the license plate was found at Cook's home. It could be inferred that defendant was concerned about the vehicle being identified.

¶ 26    Defendant would have us believe that he left the victims' home, that someone else killed them, and that A.B. mistakenly identified defendant as the perpetrator, even though A.B. would have had no reason to know that defendant had ever been in the home that morning. Unless defendant committed the crime, it would be a remarkable coincidence that A.B. identified him as the perpetrator and that he just happened to have been in the home shortly before the victims were killed.

¶ 27    Another remarkable coincidence—if defendant is innocent—is that he returned to retrieve his phone during the brief interval between when A.B. went to Saunders's home and when the police arrived. Before going to Saunders's home, A.B. attempted to call Buttita. The uncompleted calls were made between 2:05 and 2:08 a.m. According to Saunders's daughter, it was 2:13 a.m. when she heard A.B. knocking on the door. The first officer arrived at the scene at 2:24 a.m. Thus, defendant would have us believe that, although he was not the killer, he returned to the scene no more than 11 to 16 minutes after A.B. went to Saunders's home.

¶ 28 Under these circumstances, it is abundantly clear that the outcome of defendant's direct appeal would have been no different if appellate counsel had challenged the trial court's limitation of the cross-examination of Reimann. Appellate counsel's choice not to raise the issue engendered no prejudice within the meaning of *Strickland*. Defendant's corresponding postconviction claim was thus based on an indisputably meritless legal theory, and summary dismissal of the petition was proper.

¶ 29                                    III. CONCLUSION

¶ 30 For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 31 Affirmed.